SERVICE ARMAMENT CO., A NEW JERSEY CORPORATION; NRA MEMBERS FOR A BETTER NRA, INC., A NEW.JERSEY CORPORATION; HOWARD RAYMOND; GOODMAN-SHAW, INC., A NEW JERSEY CORPORATION; RUTGERS GUN AND BOAT CENTER, INC., A NEW JERSEY CORPORATION; NESHANIC DEPOT ANTIQUES, INCORPORATED, A NEW JERSEY CORPORATION; HOMESTEADER'S BLACK POWDER GUN CLUB OF BOUND BROOK, NEW JERSEY, AN UNINCORPORATED ASSOCIATION, PLAINTIFFS-RESPONDENTS, v. WILLIAM F. HYLAND, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued April 29, 1975—Decided July 15, 1976.

*Mr. Solomon Rosengarten,* Deputy Attorney General, argued the cause for appellant (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney *pro se; Mr. Rosengarten,* of counsel and on the brief).

*Mr. Charles J. Irwin* argued the cause for respondents (*Messrs. Irwin and Post,* attorneys).

The opinion of the Court was delivered by

CLIFFORD, J. We are called upon in this litigation to construe that section of the New Jersey Gun Control Law of 1966 (L. 1966, c. 60; *N. J. S. A.* 2A:151–1 *et seq.*) which exempts antique firearms from the regulatory provisions and sanctions of the statute. Specifically we must determine

if the replicas of antique muzzle-loading pistols, revolvers, and rifles which the corporate plaintiffs manufacture and sell and the associational and individual plaintiffs collect are indeed "antique firearms" and thus excluded from the Act.

The history behind this case is set forth in the opinion of the Appellate Division, 131 *N. J. Super.* 38, 43–45 (1974). Briefly, that history reveals that for seven years after the Gun Control Law was passed, it was the position of the Attorney General's office that replicas of antique firearms were, by virtue of *N. J. S. A.* 2A:151–18, not subject to regulation. On July 10, 1973, in response to an inquiry by the Bergen County Prosecutor, then Attorney General Kugler advised law enforcement officials that the replicas were to be treated as any other regulated firearm and hence were to be made subject to the licensing, recording, and permit provisions of the statute. Firearms dealers in New Jersey were duly notified by the State Police of the applicable restrictions. Plaintiffs — four corporations dealing in muzzle-loading firearms using black powder, a sportsmen's organization, an association of Civil War firearms enthusiasts, and an individual collector of Revolutionary War antique firearms — brought an action in the Appellate Division seeking a review of the Attorney General's opinion and challenging the State Police notification based thereon. That case was dismissed on the grounds that neither the Attorney General's opinion nor the notification was a final decision or action reviewable by the court within the contemplation of *R.* 2:2–3(a).

Plaintiffs then, by a separate proceeding in the Law Division, sought (a) a declaration that the exemption applied to replicas and (b) an injunction against enforcement of the Gun Control Law's regulations as interpreted in the revised position of the Attorney General's office. On cross-motions for summary judgment plaintiffs prevailed. Thereupon the State applied for a stay of the trial court's judgment, which was granted by the Appellate Division. We reviewed that stay on an emergent basis and declined to dissolve it. Sub-

sequently the Appellate Division heard argument and affirmed the lower court's decision in plaintiffs' favor. 131 *N. J. Super.* 38 (1974). We granted the State's petition for certification. 67 *N. J.* 80 (1975). We now reverse.

I

The statute at issue, *N. J. S. A.* 2A:151–18[1] exempts three types of antique firearms while leaving the term "antique firearm" undefined. Excluded from the Gun Control Law are: (1) antique firearms which are inoperable; (2) antique firearms which do not fire fixed ammunition; and (3) antique firearms manufactured before 1898 for which cartridge ammunition is unavailable commercially. These guns must be possessed as curiosities or for their ornamental or historical value to qualify for the exception.

Plaintiffs manufacture, sell, and collect replicas of black powder muzzle-loaders, and they argue that these firearms, which are operable but which do not fire fixed ammunition, are identified in *N. J. S. A.* 2A:151–18 and thus fall within the exception set out by the statute. This contention is supportable if the term "antique" contemplates a replica.

Our concern, then, being with the meaning of what the Legislature said, we resort to that overriding principle of statutory construction that in the absence of an explicit indication of special meaning, words will be given their ordinary and well-understood meaning. *Safeway Trails Inc. v. Furman,* 41 *N. J.* 467, 487, *cert.* den., 379 *U. S.* 14, 85 *S. Ct.* 144, 13 *L. Ed.* 2d 84 (1964); *Fahey v. City of Jersey City,* 52 *N. J.* 103, 107 (1968). The pertinent definitions of the term "antique" when used as an adjective are set forth

---

[1]*N. J. S. A.* 2A:151–18 provides: *Antiques and ornaments exempted*
This chapter does not apply to antique firearms which are incapable of being fired or discharged or which do not fire fixed ammunition, or those manufactured before 1898 for which cartridge ammunition is not commercially available, and are possessed as curiosities or ornaments or for their historical significance or value.

in Webster's Third New International Dictionary as follows:[2]

> 1: existing *since* ancient or former times; among the oldest of its class. * * * 2: of or belonging to earlier periods: ANCIENT. * * * 3: exhibiting the style or fashion of ancient or former times: OLD-FASHIONED, ARCHAIC. * * * 5: * * * b: having the appearance of age: suggesting the crafts of an older period. * * *

Plaintiffs champion the third sense, "exhibiting the style or fashion of ancient or former times"; and the fifth sense, "having the appearance of age," also lends credibility to their argument. We discern an emphasis on age, however, permeating the senses listed in Webster's. For example, Webster's directs the reader to the adjective "old" as a synonym of the word "antique." This stress on age extends through the pertinent definitions of "antique" when it is used as a noun:

> 1a: A relic or object of ancient times or of an earlier period than the present b: a work of art, piece of furniture, or decorative object made at a much earlier period than the present and according to U.S. customs laws at least 100 years old. * * *

Further, it strains the general conception of an antique to apply the term to an unlimited series of artifacts in various stages of present production. At least part of the real value of an antique lies in its age and hence in its uniqueness. The meaning plaintiffs assert isolates style as the determinative factor and eliminates longevity and finiteness.

█ Satisfied as we may be that without further clarification the term "antique" in its conventional, accepted sense

---

[2]We do not consider the order of the senses given in the dictionary to be an indication of "preferred" meaning. See Explanatory Notes § 12.4, Webster's Third New International Dictionary, p. 19a: "The system of separating by numbers and letters reflects something of the semantic relationship between various senses of a word. It is only a lexical convenience. It does not evaluate senses or establish an enduring hierarchy of importance among them. The best sense is the one that most aptly fits the context of an actual genuine utterance."

means "old," we are fully aware that others engaged in the same legal inquiry have disagreed. It would be disingenuous to insist, therefore, that the term is not under a cloud, at least in this context.

## II

■ Before undertaking to resolve whatever ambiguity may be said to attach to the statutory language, we pause here to observe that in other jurisdictions with gun control legislation, the exception for antique weapons may expressly include replicas in the category. See 18 *U. S. C.* § 921(16), defining an antique firearm as "any firearm * * * manufactured in or before 1898; and * * * any replica * * *"; and the Florida statute, *F. S. A.* § 790.001(1): "any firearm manufactured in or before 1898 * * * or replica thereof, whether actually manufactured before or after the year 1898; * * *." See also Missouri Statutes, *V. A. M. S.* § 564.630(5), and Tennessee Statutes, *Tenn. Code Ann.* § 39-4917(f). Twice our Legislature has declined to act on bills undertaking to impose a revised gun control scheme which would have indicated that replicas were not exempted by the antique firearm provision, facts of legislative history which we do not read as an index to legislative intent. They do, however, suggest an awareness on some legislators' part — an awareness shared by the language of the federal and the other states' acts — that replicas do not fall automatically into the category of antique firearms.

## III

■■ We move past the threshold examination of the plain meaning of the language mindful that *N. J. S. A.* 2A:151-18 sets forth an exception to the provisions of a comprehensive statutory scheme. Therefore, when we construe this section, we are guided by both the legislative intent and the general principle that exceptions in a legislative enactment are to be strictly but reasonably construed, consistent

with the manifest reason and purpose of the law. *Wright v. Vogt,* 7 *N. J.* 1, 6 (1951) ; *Palkoski v. Garcia,* 19 *N. J.* 175, 181 (1955). Emphasizing these considerations, the United States Supreme Court has held that where the purpose of legislation is remedial and humanitarian, any exemption must be narrowly construed, giving due regard to the plain meaning of the language and the legislative intent. "To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people." *Phillips v. Walling,* 324 *U. S.* 490, 493, 65 *S. Ct.* 807, 89 *L. Ed.* 1095, 1099 (1945) (construing exceptions to employers' responsibilities under the Fair Labor Standards Act). See *Yellow Cab Co. v. New Jersey,* 126 *N. J. Super.* 81, 86 (App. Div. 1973), where the court used a similar approach in construing our Wage and Hour Law, *N. J. S. A.* 34:11–56a *et seq.*

We have characterized the Gun Control Law as "highly purposed and conscientiously designed toward preventing criminal and other unfit elements from acquiring firearms while enabling the fit elements of society to obtain them with minimal burdens." *Burton v. Sills,* 53 *N. J.* 86, 105 (1968). The remedial nature of the legislation, its paramount social purpose, and its passage after considerable effort and lobbying by its supporters and attackers all give weight to the proposition that the Legislature meant precisely what it said, and therefore an exception to the Gun Control Law must be given a narrow construction. Practically speaking, it is far more likely in light of the aims of the Act that the Legislature carved out an exception for a limited number of weapons — those which are genuine antiques — than that it excluded from the statute's reach an open-ended series of weapons whose number, while not limitless, is nevertheless largely dependent upon the law of supply and demand.

## IV

■ We cannot so conclude, however, without first considering the prior enforcement policy of the Attorney General's office which grouped replicas with genuine antique firearms and thereby exempted replicas from regulation. That policy, the result of a contemporaneous construction of the statute by then Attorney General Arthur J. Sills, is set forth in an affidavit prepared by Mr. Sills for this litigation. The document constitutes that boost to statutory construction known as an extrinsic aid. In *Data Access Systems v. State*, 63 *N. J.* 158 (1973), we approved the introduction of extraneous materials in aid of construing a legislative act and noted their value in resolving ambiguities and supplying "reassuring confirmation of literally apparent meaning, as is here the case." *Id.* at 166–67.

The extrinsic aids in *Data Access Systems* included, coincidentally, a sworn statement by Mr. Sills corroborating an affidavit by one of the drafters of the Uniform Securities Law, *N. J. S. A.* 49:3–47 *et seq.* The subject of both documents was the intent behind certain revisions to the Law made in the drafting stage and eventually incorporated as provisions of the statute. This Court found these materials to be admissible even though their subject matter "may never have met the legislative eye," 63 *N. J.* at 167, because they confirmed the unambiguous language of the law.

■ Mr. Sills' affidavit now before us touches this case in an altogether different way. It sets forth his understanding, based on a close participation in the drafting and presentation of the Gun Control Law, that the draftsmen and legislators intended replicas to be exempt from regulation.[3]

---

[3]In accord with this construction of the Gun Control Law, on then Attorney General Sills' behalf and with his knowledge, firearms dealers were advised in 1966 that black powder muzzle-loading pistols, revolvers, and rifles were excluded from regulation. Such remained the position of the Attorney General's Office during Mr. Sills' tenure. In July, 1973 when the policy was questioned, the Division

As such, of course, it does not supply confirmation of literally apparent meaning. The question then comes down to how much weight we should accord the contemporaneous construction of the antique firearms exception by the Office of the Attorney General and the resultant seven year enforcement of the statute in conformity with that construction.

The principle is well established by a wealth of authority that resort may be had to long usage, contemporaneous construction and practical interpretation in construing statutes, to ascertain the meaning of technical terms, to confirm a construction deduced from the language, to explain a doubtful phrase or where the meaning is obscurely expressed. [*State Department of Civil Service v. Clark*, 15 N. J. 334, 341 (1954) (Wachenfeld, J.).]

Accord, *Lloyd v. Vermeulen*, 22 N. J. 200, 210 (1956); *Pringle v. N. J. Dept. of Civil Service*, 45 N. J. 329 (1965). It is with no little deference, then, that a court considers the interpretation of the agency responsible for enforcing a statute.

However, such an interpretation is not conclusive. *Safeway Trails, Inc. v. Furman, supra*, 41 N. J. at 483 (1964). In *Mayflower Securities v. Bureau of Securities*, 64 N. J. 85, 93 (1973), this Court noted: "An appellate tribunal is, however, in no way bound by [an] agency's interpretation of a statute * * *." The construction of statutes is a judicial, not an executive function, see *Soc. Security Bd. v. Nierotko*, 327 U. S. 358, 369, 66 S. Ct. 637, 90 L. Ed. 718, 727 (1946), and the qualification to the familiar principle that administrative construction should be accorded considerable weight is as well-established as the

of Criminal Justice of the Office of Attorney General Kugler, after consideration and review, disavowed the earlier interpretation as incorrect and so informed all county prosecutors and the state police. In a letter to this Court supported by legal authority, the present Attorney General, William F. Hyland, concurs with the Division of Criminal Justice, taking the position that "the Legislature, although providing an exception for antique firearms, did not intend to permit the unregistered sale of mass-produced, inexpensive and lethal firearms, coincidentally replicas of antique firearms."

principle itself. *Burnet v. Chicago Portrait Co.*, 285 *U. S.* 1, 16, 52 *S. Ct.* 275, 76 *L. Ed.* 587, 595 (1932). In keeping with its judicial duties, a court is bound to override an administrative construction where it is clearly contrary to the plain meaning of the statute. *Safeway Trails, Inc. v. Furman, supra; Kingsley v. Hawthorne Fabrics*, 41 *N. J.* 521, 528 (1964); *United Stations of N. J. v. Getty Oil Co.*, 102 *N. J. Super.* 459, 472–74 (Ch. Div. 1968), aff'd *o. b.*, 54 *N. J.* 150 (1969); *Automatic Merchandising Council of N. J. v. Glaser*, 127 *N. J. Super.* 413, 420 (App. Div. 1974).

*United Stations of N. J. v. Getty, supra,* has significant parallels with this case. Certain gas station owners challenged the games used as promotional devices by the major oil companies in the late 1960's, arguing the games were actually "games of chance" proscribed by the statute regulating the sale of fuel in the state, *N. J. S. A.* 56:6–1 *et seq.* Subsection 56:6–2(f) outlawed "lotteries, prizes, wheels of fortune, punch-boards or other games of chance [used] in connection with the sale of motor fuels." Defendants contended that the "no purchase necessary" feature of their promotional effort took it out of the statute's "games of chance" prohibition. To support this position defendants pointed to an opinion by the First Assistant Attorney General which concluded that the games were not contemplated by statute. The trial court rejected the argument:

> Defendants · argue that somewhat similar promotions have been conducted over the years with approval of the administrative agency charged with the enforcement of the subject statute, and that I should respect this approval. Administrative construction of the relevant statute is entitled to great weight, especially when such construction is substantially contemporaneous with the enactment of the statute and is followed for many years. However, where that interpretation conflicts with the court's view of the plain meaning of the language used and the statutory purpose, the court should not hesitate to reject it. [citations omitted.] [102 *N. J. Super.* at 473.]

Both the instant case and *United Stations of N. J. v. Getty* involve statutes using ordinary terms which on their

face pose no great complexities. Both cases involve as parties commercial concerns with sizable investments in the activities touched by statute, firms who continued a course of conduct for a substantial period of time before it was questioned. Most significantly, the Attorney General's office issued an interpretation in both cases which came under judicial scrutiny. The reasoning of the Chancery Division in the earlier case remains persuasive, and leads us to reaffirm the principle that where the divergence of the administrative interpretation from the statutory language is acute, this Court perforce must give less weight to the former.

Supporting our departure from the contemporaneous construction of the Attorney General's office is the fact that the interpretation favoring plaintiffs was not rendered in a formal opinion. The State characterized it at oral argument as an "off-the-cuff" appraisal. The revised interpretation of Attorney General Kugler's office was announced by a memorandum buttressed by legal authority, and Attorney General Hyland's letter to this Court reaffirming that policy is similarly backed by authorities. As in *Safeway Trails, Inc. v. Furman, supra,* two different constructions have issued out of the same agency, and a court can — and in this case should — give some weight to the reconsideration and revision, 41 *N. J.* at 483–84.

Moreover, an administrative interpretation which attempts to add to a statute something which is not there can furnish no sustenance to the enactment. See *Kingsley v. Hawthorne Fabrics, supra;* accord, *Automatic Merchandising Council v. Glaser, supra.* "An administrative agency may not under the guise of interpretation extend a statute to include persons not intended, nor may it give the statute any greater effect than its language allows." *Kingsley, supra,* 41 *N. J.* at 528. The agency interpretation plaintiffs rely on has two effects: It extends the scope of the exception to include lethal weapons not strictly allowed in by the language the Legislature used; and it gives the statutory scheme *less* effect than its language allows. The

net result inevitably is a dilution of the Gun Control Law, legislation that was passed as a sorely needed protection for the public welfare.

In *Burton v. Sills, supra,* wherein we upheld the constitutionality of the enactment, 53 *N. J.* at 106, the plaintiffs explicitly recognized a need for control of the sale of handguns through mail order purchases. This led us to declare, "[i]t is indeed difficult to understand why their recognition does not quickly carry over into the equally serious and perhaps greater problems created through the free availability by direct purchase of pistols, rifles, and other types of firearms." *Id.* at 105. That same free availability would exist if plaintiffs' position here were to prevail.

Access to lethal weapons by all, the fit and the unfit, is precisely what the Gun Control Law seeks to regulate. A construction granting such access indiscriminately to the criminal as well as the hobbyist would offend the spirit and intent of the Act.

## V

The judgment of the Appellate Division is hereby: Reversed.

*For reversal*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER—6.

*For affirmance*—None.