3 N.J. Tax 39 (1981)
JACKSON TOWNSHIP, PLAINTIFF,
v.
PATSY A. PAOLIN, DEFENDANT.
PATSY A. PAOLIN, PLAINTIFF,
v.
JACKSON TOWNSHIP, DEFENDANT.
Tax Court of New Jersey.
June 29, 1981.
*41 Ronald L. Lueddeke for Jackson Township (Joseph F. Martone, attorney).
Robert A. Rothstein for Patsy A. Paolin (Rothstein, Mandell & Strohm, attorneys).
CONLEY, J.T.C.
These consolidated proceedings involve application of the Farmland Assessment Act of 1964, N.J.S.A. 54:4-23.1 et seq., and the imposition of rollback taxes pursuant to N.J.S.A. 54:4-23.8. At issue is the taxable status of two parcels of land in Jackson Township, Block 40, Lot 70, consisting of 7.16 acres of vacant land, and Block 40, Lot 84, consisting of 46.17 acres. The two lots are separated by an eight-acre parcel of land owned by a third party. Jackson Township has appealed from judgments of the Ocean County Board of Taxation granting farmland assessment with respect to Lot 70 for 1976 and 1977 and with respect to Lot 84 for 1976. The county board subsequently issued judgments imposing rollback taxes on Lot 70 for 1976 and 1977 and on Lot 84 for 1976, 1977 and 1978 because of a cessation of farming activity on the properties as of 1977 and 1978. Taxpayer Paolin has appealed from these judgments. Paolin has also appealed from a county tax board judgment denying farmland assessment for both lots for 1979.[1]

Lot 70
Jackson Township urges preliminarily that Paolin should not have been granted farmland assessment by the Ocean County Board of Taxation for 1976 and 1977 with respect to Lot 70 and that the township properly denied farmland assessment for the same lot for 1979 because Paolin filed no application for Lot 70 *42 under the Farmland Assessment Act for any of these years. The township's tax assessor testified that the taxpayer's applications for farmland assessment prior to 1976 referred only to Lot 84, and that Paolin's 1976 and 1977 farmland assessment applications for Lot 84 included a reference to Lot 70 but reflected only the amount of acreage of Lot 84. None of these applications was placed in evidence. Paolin's 1979 application was put into the record and it refers only to Lot 84. Paolin's attorney stipulated that no separate application was ever filed for Lot 70. He stated at trial that the taxpayer thought his application for Lot 84 would be sufficient in any year to claim farmland assessment for both lots because the properties are in such close proximity to each other.
The taxpayer's contention must be rejected. A regulation of the Director of the Division of Taxation provides in part as follows:
Where separate, noncontiguous parcels of land in agricultural or horticultural use, in single ownership, are located in the same taxing district, a separate application for farmland assessment must be made with respect to each parcel. [N.J.A.C. 18:15-3.2(e)]
The printed instructions on all farmland assessment applications state this same proposition in a different way:
1. GENERAL  Only one application form in duplicate shall be filed for each farm made up of contiguous land. Enter in section 2 all of the lot and block numbers which make up the total area of each farm unit of contiguous land.
........
4. DESCRIPTION  State block(s) and lot(s) as shown on the official tax map or page(s) and line(s) on the current year's tax list that make up a farm unit of contiguous land.
The obvious purpose of this requirement for a separate application for each noncontiguous property is to put the tax assessor on notice as to the specific lots for which the benefits of farmland assessment are being sought. This enables the assessor to make appropriate inquiries concerning the current use of the property. If no application were filed and the taxpayer in the following year were able to appeal from the inevitable absence of a farmland assessment on his property, the assessor would be at a distinct disadvantage at trial in attempting to *43 refute a taxpayer's claim that he had devoted his property to an agricultural or horticultural use in the prior year.
No application for farmland assessment having been filed with respect to Lot 70 for any year, no farmland assessment should have been granted for that lot. Accordingly, the judgments of the Ocean County Board of Taxation granting farmland assessment to Lot 70 for 1976 and 1977 are reversed. The county board's subsequent judgment imposing rollback taxes with respect to Lot 70 for 1976 and 1977 is therefore mooted and will be vacated. The denial of farmland assessment for Lot 70 in 1979 by the Jackson Township assessor and the county board is affirmed because no application for farmland assessment was filed for that year.

Lot 84
The major issue presented with regard to Lot 84 is whether the property was "actively devoted to agricultural ... use" in 1978 within the meaning of N.J.S.A. 54:4-23.1 et seq., and, if not, whether the property was "applied to a use other than agricultural" in 1978 so as to invoke a rollback tax assessment for that year and the two preceding years pursuant to N.J.S.A. 54:4-23.8.
Taxpayer Paolin purchased Lot 84 in 1938 and has lived there ever since. No precise description of the property was offered, but it appears from a sketch put into the record by the township that the lot contains two open areas of about seven acres each, one containing an old cornfield slightly in excess of two acres in size and one containing a sizeable number of mature apple trees. Most of the rest of the property is wooded, except for an area around the farmhouse and outbuildings. Paolin at one time raised as many as 35,000 chickens on Lot 84 and at the same time engaged in general farming. Years ago he gave up the chicken business and turned to raising vegetables in addition to general farming. Now, over 70 years old and in a deteriorating state of health, he has been much less active than in earlier years. In 1978, the pivotal year for purposes of this litigation, *44 Paolin had a leg amputated. As a result of this operation he spent three months in a hospital and additional time in a convalescent home. Except as will be discussed later, he conceded that "everything was lost" insofar as his farming was concerned in 1978 because of his health. Paolin continues to live by himself in the farmhouse on Lot 84.
Paolin testified from recollection concerning his use of the property. His testimony was somewhat vague. He said he had grown "a lot of hay" on the lot in 1978. He described the hay as a rye grass rather than clover or alfalfa. He also said that during that year he had sold close to 300 cords of wood at $12 a cord and some cedar trees at up to $25 a piece, and that in addition there were approximately 50 old apple trees which bore some fruit. Paolin testified that he had planted corn in 1978 but that deer destroyed the corn when it was only eight or nine inches high. A witness for the township later testified that Paolin had told him of planting corn in 1977 that was damaged by deer and not harvested, and that Paolin had said he planted no corn in 1978. Paolin testified that in 1979 he grew more rye grass which was cut all at one time and sold to a regular customer. When pressed for details of his farm sales in 1978, Paolin produced two receipts, one dated January 1978 for the sale of 68 cords of firewood at $10 a cord and one for the rental of a cranberry bog for $200. He had no records showing sales of apples or hay in 1978. Other evidence established that the cranberry bog was on Lot 85 rather than Lot 84. Paolin testified on cross-examination that the cordwood he sold had been from trees damaged by fire and that he sold the wood in order to clean up the property. Paolin's only other witness testified that the property in 1978 and 1979 had produced cordwood, apples and a "hay-type" crop, although he conceded that the apples had gone to waste in 1978 and that the hay-type crop had been turned under rather than harvested. No income information was produced by either witness with regard to 1979.
The Jackson Township assessor testified that the taxpayer had never provided him with the additional information he had requested in order to evaluate the farmland assessment application *45 for Lot 84. See N.J.A.C. 18:15-3.5. The assessor made inspections of the property in June and October 1978. As of June, he observed a field of corn that had been planted in the prior year but which had not been harvested. As of October, he observed weeds two to three feet high in all fields. Both of these observations were substantiated by photographs taken at the time of the inspections. The assessor testified that he had observed no signs of active farming on the property during either visit, but on cross-examination he indicated having seen some vegetable plantings in a garden and some apples on the old trees. The assessor characterized Paolin's activity on the property in 1978 as "non-use."
Jackson Township also called as a witness Arthur Thompson, a local farmer with an extensive farming background. Thompson is employed part-time by the Jackson Township assessor to assist in the inspection of properties for which farmland assessment is sought. He testified from notes made during inspections of the property, and the court found him to be extremely credible. Thompson stated that on visits to the subject property for three hours in May and for 20 minutes in October 1979 he found partly rotted corn stalks from which he concluded that no corn had been grown on the property in 1978. From the condition of the apple trees he concluded that they had not been pruned or sprayed in a number of years, bearing very small fruit of poor quality. Thompson stated that he saw no evidence of any wood-cutting other than some limbs that had been trimmed over a roadway on the property. Thompson also testified that there was some perennial rye grass, wild grass and weeds growing in fields on Lot 84 but that he would not consider it to be hay. According to him, the only commercial value of this product would be as an inferior-quality bedding for animals.
The standards to be applied with respect to farmland assessment determinations have been set forth in many cases, including, for example, East Orange v. Livingston, 102 N.J. Super. 512, 246 A.2d 178 (Law Div. 1968), aff'd o.b. 54 N.J. 96, 253 A.2d 546 (1969) and Andover Tp. v. Kymer, 140 N.J. Super. 399, *46 356 A.2d 418 (App.Div. 1976). In the present case the proofs demonstrate that the subject property had been a fairly typical small family farm for many years, not unlike the farm in Andover Tp. v. Kymer, but that as the farmer grew old and became disabled his farming activities decreased. Applying well-established principles as set forth in the above cases, I am constrained to find from the evidence in this case that as of 1978 Lot 84 was not "actively devoted to agricultural use" within the intendment of the Farmland Assessment Act. I find that Paolin did not plant corn in 1978 and that he never harvested the corn he had planted in 1977. Paolin's fields had been taken over by weeds in 1978 and could no longer be characterized as hay fields. The value of any cutting from the fields was at best minimal. The apples produced on Paolin's trees were stunted and wormy from lack of pruning and spraying. The cutting of firewood was very occasional and not part of a farming effort. In short, I find that there was insufficient farming activity on the property in 1978 for the property to have qualified for farmland assessment and therefore it should not have received farmland assessment for that year. With respect to 1979 no competent proofs were adduced concerning the use of the property, and the county tax board's denial of farmland assessment for that year must therefore be affirmed.

Rollback Taxes
The determination that Lot 84 should not have received farmland assessment treatment in 1978 has a possible effect on other years because of the judgment of the Ocean County Board of Taxation imposing rollback taxes for 1976, 1977 and 1978. The county board judgment was entered in accordance with N.J.S.A. 54:4-23.8, which provides:
When land which is in agricultural or horticultural use and is being valued, assessed and taxed under the provisions of this act, is applied to a use other than agricultural or horticultural, it shall be subject to additional taxes, hereinafter referred to as roll-back taxes, in an amount equal to the difference, if any, between the taxes paid or payable on the basis of the valuation and the assessment authorized hereunder and the taxes that would have been paid or payable had the land been valued, assessed and taxed as other land in the taxing district, in the current year (the year of change in use) and in such of the 2 tax *47 years immediately preceding, in which the land was valued, assessed and taxed as herein provided.
This statutory language requires imposition of rollback taxes when land "is applied to a use other than agricultural or horticultural." The statute also refers to "the year of the change in use." These terms are used as equivalents. Thus, the issue is squarely presented whether loss of farmland assessment automatically triggers the imposition of rollback taxes. Stated another way, the issue is whether a finding that a property is not "actively devoted to agricultural ... use" in any year requires a finding that the property "is applied to a use other than agricultural or horticultural" and that there has been a "change in use," so as to trigger the assessment of rollback taxes. It must therefore be determined what the Legislature intended by these words.[2]
The relatively few New Jersey cases which have dealt with rollback taxes in one way or another have not considered the issue presented by this litigation because they all involved an undisputed change in use of property. The first such case was N.J. Turnpike Auth. v. Washington Tp., 137 N.J. Super. 543, 350 *48 A.2d 69 (App.Div. 1975), aff'd o.b. 73 N.J. 180, 373 A.2d 652 (1977). In that case the court held that although the Turnpike Authority was exempt from taxation on land acquired and used by it, the lands it acquired for highway use were subject to rollback taxes to the extent that the lands had been devoted to agricultural or horticultural use during the past three years. As for the factor that triggered the imposition of rollback taxes, the court stated that it was "a change in the use to which the property is applied." 137 N.J. Super. at 551, 350 A.2d 69. Accord, State v. Washington Tp., 73 N.J. 182, 373 A.2d 652 (1977). In Andover Tp. v. Kymer, supra, the court also characterized the rollback as applying in the event of "change in use," relating such a change to land speculation:
The Legislature has incorporated the rollback tax provisions in the act, N.J.S.A. 54:4-23.8, in order to help protect municipalities from land speculation by providing, where there has been a change in use, for an additional tax on the land.... [140 N.J. Super. at 405, 356 A.2d 418]
See, also, Schere v. Freehold Tp., 150 N.J. Super. 404, 375 A.2d 1218 (App.Div. 1977) (calculation of amount of rollback taxes upon change of use); Paz v. DeSimone, 139 N.J. Super. 102, 352 A.2d 609 (Ch.Div. 1976) (buyer who changed use of property incurred liability for rollback taxes); Plushanski v. Union Tp., 176 N.J. Super. 626, 1 N.J. Tax 520, 424 A.2d 473 (Tax Ct. 1980) (valuation of property subject to rollback taxes); Mahwah Tp. v. Bergen Cty., 2 N.J. Tax 479 (Tax Ct. 1981) (municipal tax search officer must disclose potential rollback tax liability to purchaser).
Since other courts have not previously construed the pertinent terms of the rollback section of the Farmland Assessment Act, this court must do so. In ascertaining legislative purpose, the court should give the relevant words their ordinary and well-understood meaning. Service Armament Co. v. Hyland, 70 N.J. 550, 556-557, 362 A.2d 13 (1976); N.J.S.A. 1:1-1. The applicable definitions of the operative words in the phrases used in the rollback sections are set forth in The American Heritage Dictionary of the English Language, as follows:

apply: ... 2. To put to or adapt for a special use.... 4. To devote (oneself or one's efforts) to something. *49 change: ... 1.a. The process or condition of changing; alteration or modification; transformation. b. The replacing of one thing for another; substitution. 2. A transition from one state, condition, or phrase to another; the change of seasons. 3. Something different; variety.
These definitions suggest that the Legislature intended an active conversion from one positive type of land use to another. An analysis of synonyms of the verb "change" is even more instructive:

Synonyms: change, alter, vary, modify, transform, convert, transmute. These verbs mean to make or become different. Change implies a fundamental difference or a substitution of one thing for another: change his mind; change trains. Alter usually means to make less of a difference or adjustment. Vary implies shifting circumstances or conditions that cause differences with some regularity. Modify can mean to restrict, limit, or qualify, and sometimes to make less extreme. Transform refers to complete change in outer form or appearance and often also in character and function. Convert can refer to moderate change designed to adapt something to new use or different conditions; to chemical change; to change in belief or doctrine; or to the exchange of something for equivalent value, either in the same form (convert dollars into pounds) or a different form (convert real estate into cash). Transmute suggests almost magical basic change that elevates something in value. [Id.]
The analysis of these synonyms suggests rather cogently that the Legislature intended that use of a property had to be fundamentally different from active devotion to agricultural use before rollback taxes would be assessable. The Legislature could have provided that rollback taxes would be due when land under farmland assessment simply ceased to be "actively devoted to agricultural use." If this language had been adopted, "non-use" of a property that had been farm-qualified would unquestionably trigger a rollback tax assessment in addition to denial of farmland assessment for "the current year." But instead of providing that cessation of the qualifying activity would trigger a rollback, the Legislature chose to use words that connote more than a mere cessation or lapse of use, and even more than an alteration or modification of a qualified use.
The history of the constitutional amendment permitting special assessment for farmland supports a construction of the rollback provision to require more than a finding of no active devotion to farming before the rollback applies. The available history has been set forth at some length in East Orange v. Livingston, supra, by Judge (now Justice) Handler. 102 N.J. Super. *50 at 531 to 535, 246 A.2d 178. In The Report of the Governor's Farmland Assessment Committee (March 20, 1963), referred to by Judge Handler, the Committee made a specific recommendation to Governor Hughes with respect to a rollback tax provision:
4. That to give protection to the municipality against pure speculation there be included a tax deferral or recapture feature of two years at the time of a change in use of the land. This recapture feature would be predicated on the difference in assessment at the new use and the farm use.... [Id. at 1; emphasis supplied]
At the public hearing on the proposed constitutional amendment, Senate Concurr. Resolu. 16 (1963), the Chairman of the Governor's Committee, Senator John A. Waddington, stated at the very outset of the proceeding that the family farm in New Jersey would be lost to development unless strong measures were taken to preserve it. He said:
The problem that we face in New Jersey is part of a national problem. This the Committee found very early in its studies which continued throughout much of last year and into this year. We found that nationally more than a million acres of farmland each year is being lost to city developments, industrial and commercial uses, and highways. [Senate Committee on Revision and Amendment of Laws, Public Hearing on S.C.R. 16, "Taxation of Lands Used in Agriculture or Horticulture," at 2 (April 15, 1963)]
With regard to the rollback feature of the proposed constitutional amendment, Waddington said:
Any exception made to the constitutional requirement that one man's land be taxed the same as anybody else's must give some protection to the rest of the community against abuse and of its being used to mask pure speculation. I think the community would and should resist being a soft touch. SCR 16 does give some measure of protection here. [Id. at 6-7]
The only other discussion of rollback taxes at the public hearing was offered by Walter Hunt, Legislative Chairman of the New Jersey Association of Township Committeemen, a group which supported the constitutional amendment. Hunt said:
Townships are the traditional governments in the more rural areas of New Jersey where most of the farms are located. They contain large amounts of undeveloped acreage and they are experiencing the many problems of adjustment to the spread of industrial and residential growth in rural areas.
........

*51 Some explanation is in order concerning the apparent willingness of hardpressed township governments to forego possible increases in local property tax ratables. It has been the experience of rural governments that new tax ratables created by persistent and continued development at a rapid rate are accompanied by new tax requirements and other changes which dissipate the financial advantages of the new ratables. Growth may be both desirable and inevitable but it should come no faster than it can be absorbed in an orderly way. This proposed amendment holds the promise of slowing up the rate of development by minimizing tax pressures upon farmers to hasten the day when they sell their lands for other uses. Also the amendment contains a provision whereby municipalities will receive some tax rollback upon farmlands which are sold for other uses.
No one believes that this amendment or programs developed under it will preserve all farmlands against future conversion to other uses. It is anticipated that the amendment will make it possible for farmers to continue to operate their farms beyond the time when property taxes would otherwise force them to sell out. [Id. at 35-36]
These comments of proponents of the constitutional amendment indicate that they viewed the incipient special assessment of farmland as a major program to slow the transition of open or undeveloped land to developed land. The Governor's Committee recommended that "use of zoning, of easements and other techniques" be studied also as part of the overall effort to maintain farmland and open space in New Jersey. Report, supra at 2. There is no suggestion in the available history of the 1963 amendment to the State Constitution or the enactment of the Farmland Assessment Act that the rollback tax feature was intended to apply automatically upon termination of the active devotion of a property to agricultural use. On the contrary, references to rollback taxes were made only in the context of preventing abuse of the anticipated farmland assessment system by those who would be involved in "pure speculation."
In addition to reviewing the ordinary meaning of the words used in the constitutional amendment and subsequent statute, and any available constitutional and legislative history, the court in construing the applicable language should look at the experience of other states that have dealt with agricultural assessments and rollback taxes if it appears that the New Jersey statute was based upon and is substantially the same as the statutes of other states. See Ciuba v. Irvington Varnish & Insulation Co., 27 N.J. 127, 137-138, 141 A.2d 761 (1958); Reale *52 v. Wayne Tp., 132 N.J. Super. 100, 108-109, 332 A.2d 236 (Law Div. 1975). In the present case it is clear that the New Jersey Farmland Assessment Act and its rollback provision were patterned on the experience of other states. Senator Waddington stressed that his committee had made its recommendations for a constitutional amendment in New Jersey after consideration of similar efforts throughout the country:
In its studies and determinations, the Committee reviewed the problem and the approaches that are being made to it in many states  California, Wisconsin, Hawaii, Florida, Maryland, Connecticut, and others.
........
We felt that [the] experience in Maryland ... was particularly interesting. [Report, supra at 2, 5]
The experience of other states as of the time New Jersey implemented its own farmland assessment program has been supplemented since then by actions in some of the same states as well as by entirely new efforts in other states. The approach taken by all the states has been so generally consistent that it is instructive to study their approaches to the problem even though the New Jersey constitutional and statutory provisions predate some of the comparable legislation. There is a considerable amount of scholarly analysis of farmland assessment and rollback taxes throughout the country, and although the following articles are not a collection of all secondary authorities on the subject, they include some of the more comprehensive discussions: Annotation, "Validity, Construction, and Effect of State Statutes Affording Preferential Property Tax Treatment to Land Used for Agricultural Purposes," 98 A.L.R.3d 916 (1980); Comment, "Agricultural Land Preservation: Washington's Approach," 15 Gonz.L.Rev. 765 (1980); Dunford, "A Survey of Property Tax Relief Programs for the Retention of Agricultural and Open Space Lands," 15 Gonz.L.Rev. 675 (1980); Keene, "Agricultural Land Preservation: Legal and Constitutional Issues," 15 Gonz.L.Rev. 621 (1980); "Assessment to Preserve Agricultural Land: With Application to the Four-State Region of Iowa, Kansas, Missouri and Nebraska," 47 UMKC L.Rev. 629 (1979); Beattie and Ransom, "Use Value Assessment: Its Causes, Its Characteristics, Its Effects," Land Policy Round *53 Table (Case Studies Series No. 302), Lincoln Institute of Land Policy (1979); Nielsen, "Preservation of Maryland Farmland: A Current Assessment," 8 Balt.L.Rev. 429 (1979); Ellingson, "Differential Assessment and Local Government Controls to Preserve Agricultural Lands," 30 S.D.L.Rev. 548 (1975); "Property Taxation of Agricultural and Open Space Land," 8 Harv.J.Legis. 158 (1970). See, also, the collection of authorities in Hoffmann v. Clark, 69 Ill.2d 402, 14 Ill.Dec. 269, 372 N.E.2d 74 (Sup.Ct. 1977).
These authorities corroborate the conclusion of the court that rollback tax provisions in farmland assessment legislation were almost never intended to apply automatically when a farm-qualified property lost its farm qualification. For example, one authority states that the common rollback provision applies "when the land use is changed from agricultural or open space to a more intensive use." 8 Harv.J.Legis., supra at 161. Another characterizes rollback taxes or deferred taxes as the most common approach to differential assessment, involving the recovery of some of the taxes saved "if and when the use is converted from agricultural to urban." 20 S.D.L.Rev., supra at 558. Maryland, which was studied closely by the New Jersey draftsmen, is said to have adopted its rollback tax "to discourage conversion of agricultural land to other uses by levying a tax on persons who develop agricultural land...." 8 Balt.L. Rev., supra at 431-432. These and virtually all other discussions of farmland assessment legislation and rollback tax provisions stress the intent of legislatures to slow down the transition of farmland to urban and suburban development and to recapture the taxes saved under a farmland assessment program only when some active conversion of farm property occurs. The purpose of farmland assessment programs is met in large measure on a year-to-year basis when landowners devote their properties to farming. When these owners cease active farming they lose the benefit of a reduced assessment for the year of such cessation. However, there is no apparent legislative intent to require farmers and other landowners to forfeit the legitimate benefit they received for prior years unless they have taken some action to develop the property that had been farmed.
*54 In fact, a consideration of the severity of some rollback provisions would tend by itself to indicate that they were not designed for imposition on property that becomes under-utilized, as has Paolin's property in the present case, but rather only on property that has been applied to a more intensive and presumably more profitable use. According to one article,
... [the State of] Washington ... is notable for the severe roll-back imposed. For timberland it can run up to 20 years, and for other land, up to 14 years. In addition, a special penalty payment of 20 percent of the deferred taxes is payable plus interest. California also has a severe penalty payment of 50 percent of the full cash value of the land which is assessed at the time the land use is changed. [8 Harv.J.Legis., supra at 161]
Nothing suggests that the purpose of the New Jersey rollback tax is different from these more extreme measures in any substantive sense.
It is difficult to imagine that the intent of any rollback provision was to impose an extra tax burden on a landowner who simply grew old or became disabled and no longer could actively devote his property to agriculture. One of the primary objectives of the Farmland Assessment Act was to help preserve the family farm in this State, and it would be inconsistent with this purpose if we were to conclude that rollback taxes become due, perhaps requiring the sale of the farm, merely because the owner ceased to devote the property to agriculture on an active basis. At the very least, rollback taxes are not triggered until the land is applied to a more intensive use than that for which it received farmland assessment. Cf. N.J.S.A. 40:55D-1 et seq.
We hold, therefore, that Paolin's failure to devote his property actively to agriculture within the intent of the Farmland Assessment Act in the year 1978 was not an "application of the property to a use other than agriculture" and was not a "change in use" of the property within the intent of N.J.S.A. 54:4-23.8 so as to trigger imposition of rollback taxes upon the property. Accordingly, the judgment of the Ocean County Board of Taxation imposing rollback taxes on Lot 84 for 1976, 1977 and 1978 is reversed. However, since the property should not have received farmland assessment for 1978 and since the township's right to challenge the county board's grant of farmland *55 assessment for that year was preserved by operation of the rollback tax procedure, judgment will be entered denying farmland assessment to Lot 84 for 1978.
Since the determination of the valuation of Lot 70 for 1976 and 1977 and of Lot 84 for 1976 was deferred pending this decision on farmland assessment, the entry of judgment will be held in abeyance until disposition of the valuation appeals. Cf. R. 8:9-3. The matter will be listed for trial on the issue of valuation for both lots for the years under appeal.
NOTES
[1] Jackson Township filed an appeal with respect to the valuation of Lot 70 for 1975 but that litigation was settled. The valuation of Lot 70 for 1976 and 1977 and of Lot 84 for 1976 was raised by the pleadings but has been held in abeyance pending the present decision as to qualification of the lots for farmland assessment.
[2] The rollback provision in the statute is mandated by language added to the State Constitution in 1963 directing the enactment of laws giving beneficial assessment treatment to qualified farmland. N.J.Const. (1947), Art. VIII, § 1, ¶ 1(b). The language in the Constitution was followed almost word for word in N.J.S.A. 54:4-23.8, including the phrase that the land would be subject to rollback taxes when it "is applied to a use" other than for agriculture or horticulture. The full text of the relevant provision of the Constitution is as follows:

Any such laws shall provide that when land which has been valued in this manner for local tax purposes is applied to a use other than for agriculture or horticulture it shall be subject to additional taxes in an amount equal to the difference, if any, between the taxes paid or payable on the basis of the valuation and the assessment authorized hereunder and the taxes that would have been paid or payable had the land been valued and assessed as otherwise provided in this Constitution, in the current year and in such of the tax years immediately preceding, not in excess of 2 such years in which the land was valued as herein authorized. [N.J.Const. (1947), Art. VIII, § 1, ¶ 1(b)]
The parenthetical phrase, "the year of the change in use," appearing in N.J.S.A. 54:4-23.8, does not appear in the Constitution and apparently was inserted into the statute in order to clarify the term "current year."