935 A.2d 1197

HOUSING AND REDEVELOPMENT AUTHORITY OF THE
TOWNSHIP OF FRANKLIN, PLAINTIFF–RESPONDENT,
v. BERTHA MILLER, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued November 7, 2007—Decided November 19, 2007.

Before Judge COBURN, GRALL and CHAMBERS.

*Norma Melendez* argued the cause for appellant (*Legal Services of Northwest Jersey,* attorneys; *Ms. Melendez,* on the brief).

*Darryl W. Simpkins* argued the cause for respondent (*Simpkins & Simpkins,* attorneys; *Victoria Curtis Bramson, Mr. Simpkins and Paula H. Simpkins,* of counsel and on the brief).

The opinion of the court was delivered by

COBURN, P.J.A.D.

Plaintiff, Housing and Redevelopment Authority of the Township of Franklin, filed this summary dispossess action against one of its tenants, defendant Bertha Miller. Plaintiff sought eviction because Miller had engaged in criminal activity that threatened the health or safety of other tenants, or their right to peaceful enjoyment of the public housing premises. After a bench trial, plaintiff obtained a judgment of possession, and Miller appealed.

The primary issue is whether eviction from federally subsidized public housing can be based on a tenant's commission of a "disorderly persons offense," or whether eviction requires proof of a "crime," as those concepts are defined in the New Jersey Criminal Code. We hold that commission of a disorderly persons offense justifies eviction under federal law if the conduct threatens

the health or safety of other tenants, or their right to peaceful enjoyment of the public housing premises. Therefore, we affirm.

## I

A brief summary of the material facts will suffice since Miller does not contend the judge erred in finding that she had assaulted two other tenants. In 2006, Miller and her four minor children lived in an apartment in a federally subsidized housing complex operated by plaintiff. As required by federal law, Miller's lease contained the following provisions:

Tenant shall be obligated:

\* \* \*

L. To abide by the one strike policy and to assure that Tenant, any member of the household, a guest, or another person under Tenant's control, shall not engage in:

(1) Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the Authority's public housing premises by other residents or employees of the Authority. . . .

\* \* \*

Any criminal activity in violation of the preceding shall be cause for termination of the tenancy, and for eviction from the unit.

**Violations of this Part II, Section (L) shall be considered a serious breach of the material terms of the Lease. A criminal conviction or arrest is not necessary for this Lease to be terminated and for eviction proceedings to be instigated.**

On April 6, Miller, accompanied by at least ten other people, went to another tenant's apartment in the complex. Miller kicked the door, while loudly cursing and accusing the tenant, Jorge Ruiz, who was not then home, of having done something to one of her daughters. A short time later, Ruiz arrived at the complex, riding on a bicycle and carrying groceries. Miller, three of her daughters and some other girls, immediately attacked Ruiz. For a considerable time, they punched and kicked him and damaged his bicycle and groceries. A witness, Deatria Jackson, whose apart-

ment was across from Ruiz's apartment, called the police. As the police arrived, Miller and the others fled.

Soon after the police left, Miller went to Jackson's apartment and hit the door with sufficient force to knock it open. Miller accused Jackson of calling the police and suddenly punched Jackson in the face and fought with her. The police were called again, and when they arrived one of the officers saw that Jackson's shirt was ripped, her arm was scratched, and her face was scratched and swollen. The next day, Miller threatened Jackson with violence, saying, "Bitch, I'm going to get you." Later on, the police were called to the scene again because Miller and others were seen approaching Jackson's apartment while shouting that they were going to "get" her.

Ruiz and Jackson filed criminal complaints against defendant in municipal court, and on May 26, plaintiff filed this summary dispossess action. Ruiz's municipal court complaint was dismissed when he did not appear, but defendant pled guilty to Jackson's complaint on July 26. The judgments of conviction were entered for simple assault, *N.J.S.A.* 2C:12–1(a)(1), a disorderly persons offense, and for harassment, *N.J.S.A.* 2C:33–4(a), a petty disorderly persons offense.

## II

In general, federally-subsidized public housing agencies, such as plaintiff, are charged with the responsibility of providing safe housing for their tenants. 42 *U.S.C.A.* § 1437(a)(1)(A). That goal is advanced by 42 *U.S.C.A.* § 1437d(*l*)(6), which says, among other things, that every public housing agency lease must

> provide that any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants or any drug-related criminal activity on or off such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be good cause for termination of tenancy. . . . [1]

---

[1] Our Anti–Eviction Act provides, in pertinent part, that in "public housing under the control of a public housing authority or redevelopment agency," a residential tenant may be evicted if the tenant

That provision is implemented in regulations issued by the Department of Housing and Urban Development ("HUD"). One of those regulations says that a housing authority may

> evict the tenant by judicial action for criminal activity in accordance with this section if [the housing authority] determines that a covered person has engaged in the criminal activity, *regardless of whether the covered person has been arrested or convicted for such activity and without satisfying the standard of proof used for criminal conviction.*

[24 *C.F.R.* § 966.4(*l*)(5)(iii)(A) (emphasis added).]

Another regulation says that a housing authority may

> *consider all circumstances relevant to a particular case* such as the seriousness of the offending action, the extent of participation by the leaseholder in the offending action, the effects the eviction would have on family members not involved in the offending activity and the extent to which the leaseholder has shown personal responsibility and has taken all reasonable steps to prevent or mitigate the offending action.

[*Id.* at § 966.4(*l*)(5)(vii)(B)(emphasis added).]

This federal statute was enacted for the broad purpose of making public housing safer. When construing "a broad sweeping remedial statute," the rule to be applied is that its "manifest policy" is an "implied limitation on the sense of the general terms and a touchstone for the expansion of the narrower terms." *Glover v. Simmons Co.,* 17 *N.J.* 313, 319, 111 *A.*2d 404 (1955) (citation omitted). Thus in these circumstances, "the declared policy is the key to the understanding of the statute." *Ibid.* (citations omitted). In short, the statute must be construed liberally so that "its beneficent purposes may be accomplished." *Torres v. Trenton Times Newspaper,* 64 *N.J.* 458, 461, 317 *A.*2d 361 (1974). With those general principle in mind, we turn to Congress's use of the phrase "criminal activity" in 42 *U.S.C.A.* § 1437d(*l*)(6).

---

> has substantially violated or breached any of the covenants or agreements contained in the lease for the premises pertaining to illegal uses of controlled dangerous substances, *or other illegal activities ... provided that such covenant or agreement conforms to federal guidelines regarding such lease provisions ....*

[*N.J.S.A.* 2A:18–61.1(e)(2) (emphasis added).]

We begin our analysis by noting that the phrase "criminal activity" is not the customary method of describing or defining a non-civil offense.

At common law, crimes were divided into three major groups, treason, felony, and misdemeanor, *Perkins on Criminal Law* 9 (2d ed.1969), concepts still used often in federal criminal statutes. In *Schick v. United States,* 195 *U.S.* 65, 69, 24 *S.Ct.* 826, 827, 49 *L.Ed.* 99, 102 (1904), the Court cited with approval Blackstone's definition of common law crime as including crimes and misdemeanors, with the further understanding that misdemeanors generally involve smaller faults. The issue in *Schick* was whether the Constitutional right to trial by jury applied to petty offenses. The Court's answer was no. In reaching that conclusion, the Court noted that as originally drafted, the Constitution referred to "criminal offenses," but that in its final form that phrase was dropped and in its place appeared the word "crimes." *Id.* at 70, 24 *S.Ct.* at 827, 49 *L.Ed.* at 102. The Court had this to say about the distinction:

> The significance of this change cannot be misunderstood. If the language had remained "criminal offenses," it might have been contended that it meant all offenses of a criminal nature, petty as well as serious; but when the change was made from "criminal offenses" to "crimes," and made in the light of the popular understanding of the meaning of the word "crimes," as stated by Blackstone, it is obvious that the intent was to exclude from the constitutional requirement of a jury the trial of petty criminal offenses.
>
> [*Ibid.*]

██ It has often been said that "[i]n construing a statute it is to be assumed that the [legislative body] is thoroughly conversant with its own legislation and the judicial construction placed thereon." *In re Keogh–Dwyer,* 45 *N.J.* 117, 120, 211 *A.2d* 778 (1965) (citation omitted). Although the Court in *Schick* was interpreting the Constitution, its analysis is relevant by implication to the problem of statutory construction with which we are concerned. That is so because one can reasonably infer that Congress understood when it enacted the legislation at issue that its use of the phrase "criminal activity" would be construed in light of distinctions such as those drawn by the Court in *Schick.* In other words,

if Congress wanted to draft a narrower statute, one that applied only to crimes, as Miller argues, instead of "criminal activity," it would have used such words as "felony" or "crime."

Another overriding principle of statutory construction informs our conclusion: "in the absence of an explicit indication of special meaning, words will be given their ordinary and well-understood meaning." *Serv. Armament Co. v. Hyland*, 70 *N.J.* 550, 556, 362 *A.*2d 13 (1976). "Activity" means engaging in an action or behavior. "Criminal behavior" has been defined as "[c]onduct that causes social harm and is defined and punished by law." *Black's Law Dictionary* 380 (7th ed.1999). Although disorderly persons offenses, as defined in the New Jersey Criminal Code, might fairly be described as petty offenses, given *Schick's* interpretation of the phrase "criminal offenses" as including "petty" offenses, we have no doubt that when Congress used the even broader phrase "criminal activity," it intended to include conduct that we, and other states, define as disorderly or petty disorderly offenses. With at least one exception, to which we will turn in a moment, the only limitation placed on the concept of "criminal activity" by the Congress was that it had to involve conduct that threatened the health or safety of other tenants, or their right to peaceful enjoyment of the public housing premises.

Further proof of Congress's intent appears in an exception included within 42 *U.S.C.A.* § 1437d(*l*)(6). After stating that "criminal activity" that "threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants" is cause for termination of the lease, this section goes on to provide that it will not apply to

> criminal activity directly relating to domestic violence, dating violence, or stalking, engaged in by a member of a tenant's household or any guest or other person under the tenant's control ... if the tenant or immediate member of the tenant's family is a victim of that domestic violence, dating violence, or stalking.
>
> . . .

[42 *U.S.C.A.* § 1437d(*l*)(6)(A).]

Under our Prevention of Domestic Violence Act of 1991, *N.J.S.A.* 2C:25–17 to –35, the predicate acts for domestic violence include the disorderly persons offenses of simple assault, *N.J.S.A.*

2C:12–1(a), and lewdness, *N.J.S.A.* 2C:14–4(a); and the petty disorderly offenses of defiant trespasser, *N.J.S.A.* 2C:18–3(b) and harassment, *N.J.S.A.* 2C:33–4(a) through (c). When Congress enacted its statute it surely was aware that some acts of domestic violence are defined here and in other states as including disorderly and petty disorderly offenses. Thus, the statutory exception clearly indicates that offenses of this nature were intended to come within the category of "criminal activity" justifying eviction, except when the tenant or an immediate family member was the victim.

Miller's remaining arguments are without sufficient merit to warrant discussion in a written opinion. *R.* 2:11–3(e)(1)(E).

We close with this thought. In light of the egregious circumstances of this case, if we accepted Miller's argument that simple assaults were not grounds for eviction under the federal statute, no public housing could be rendered safe, and the statute would fail to achieve its declared policy. Since the statute is broadly remedial, and since Congress's declared policy is the key to interpretation, *Glover, supra,* 17 *N.J.* at 319, 111 *A.*2d 404, Miller's arguments must be rejected.

Affirmed.