946 A.2d 564

GLEN REILLY, PETITIONER–APPELLANT, v. AAA MID-
ATLANTIC INSURANCE COMPANY OF NEW
JERSEY, RESPONDENT–RESPONDENT.

Argued November 27, 2007—Decided May 14, 2008.

*Glen Reilly* argued the cause pro se.

*Vicki A. Mangiaracina,* Deputy Attorney General, argued the cause for respondent New Jersey Department of Banking and Insurance (*Anne Milgram,* Attorney General of New Jersey, attorney; *Patrick DeAlmeida,* Assistant Attorney General, of counsel).

*Donald M. Barone* argued the cause for respondent AAA Mid–Atlantic Insurance Company of New Jersey (*Gelfand, Barone & Bava,* attorneys).

*Thomas G. Smith* submitted a letter brief on behalf of amicus curiae Property Casualty Insurance Association of America.

Justice HOENS delivered the opinion of the Court.

In this matter, we consider whether, and under what circumstances, a driver who is involved in a single-vehicle accident may be considered to be "at-fault" for purposes of assessing insurance eligibility rating points. Because we conclude that, under the circumstances presented, the Department of Banking and Insurance has applied its regulations in a manner that exceeds the scope of its statutory authority, we reverse.

I.

The facts are not disputed. Plaintiff Glen Reilly was returning home from a ski trip in Pennsylvania on January 2, 2003. He was driving on Route 15 in northwestern New Jersey in weather that was cold and rainy. There had been no snow or ice warnings in the weather forecast. Because of the rain, all of the cars on the road, including plaintiff's, were traveling approximately 45 m.p.h. in a 55 m.p.h. speed limit zone, each driver leaving several car lengths between vehicles. Shortly before 7:30 p.m., plaintiff suddenly and without warning came upon a patch of black ice and lost control of his car. The vehicle spun 180 degrees and slid from the left lane until it collided with the guardrail on the right side of the road. No other vehicles were involved and the investigating police

officer did not issue a ticket or traffic citation to plaintiff as a result of the accident.

Plaintiff testified that he had not seen any accidents that night prior to his own, but witnessed many on the remainder of his trip home. Newspaper accounts the next day described the conditions throughout northern New Jersey as a "Black Ice Nightmare" that created "treacherous" driving conditions. George Berken and Mark Mueller, *Black Ice Nightmare,* The Star Ledger, Jan. 3, 2003, at 1. The weather "spark[ed] hundreds of accidents" and "[b]esieged police departments" unable to keep pace with the resulting "mayhem." *Ibid.*

At the time of the accident, plaintiff had automobile insurance through State Farm Insurance Company (State Farm), which reimbursed him in excess of one thousand dollars for damage that the vehicle sustained in the incident. At the same time, State Farm, without alerting plaintiff, determined that the January 2, 2003 accident was an "at-fault" accident and assigned five insurance eligibility points to him for future underwriting purposes. For reasons not specified in the record, plaintiff later decided to change insurance companies and applied for automobile coverage from defendant AAA Mid–Atlantic Insurance Company of New Jersey (AAA). Although defendant issued an insurance policy to plaintiff, the company also concluded that the January 2, 2003 accident was an "at-fault" accident and also assigned plaintiff five eligibility points, along with two points based on an unrelated moving violation on September 28, 2001. As a result, defendant assigned plaintiff a total of seven insurance eligibility points.

The applicable regulations in effect at the time of plaintiff's accident permitted an insurer to voluntarily decline coverage to any driver who had nine eligibility points, *see N.J.A.C.* 11:3–34.4(a)(8) (2002) *amended by* 35 *N.J.R.* 3260(a) (Jul. 21, 2003). In December 2003, however, the regulation was amended so as to lower the threshold from nine to seven points, *see* 35 *N.J.R.* 3260(a) (Jul. 21, 2003). Based on plaintiff's seven points, he could

not meet this requirement, as a result of which defendant declined to renew plaintiff's policy in April 2004.

Plaintiff challenged his non-renewal and the five point assessment through an appeal to the Department of Banking and Insurance ("the Department"). After the Department issued a preliminary finding that defendant's assessment of points was correct, plaintiff again appealed, and the matter was transferred to the Office of Administrative Law for a hearing.

During an April 4, 2005, hearing before an Administrative Law Judge (ALJ), both plaintiff and Danielle Sease, an underwriter for defendant AAA, testified. Plaintiff testified about the road conditions on the night of the accident and offered evidence to support his assertion that the black ice condition was unexpected and created an extraordinarily hazardous emergency.

Sease offered no contrary version of the facts, but testified that the accident was, nevertheless, properly classified as "at-fault." She explained that the 2003 accident was reviewed twice by AAA for its underwriting purposes. First, when plaintiff applied for coverage, another underwriter determined that plaintiff's 2003 accident was "at-fault," and five points were assigned at that time. In addition, Sease testified that she had independently reviewed the 2003 accident and concluded that it was correctly deemed to be an "at-fault" accident. According to Sease, because a driver is expected to maintain control of his or her vehicle at all times, the driver is deemed "at-fault" for an accident unless there is another party to whom fault can be attributed.

The ALJ found Reilly's testimony "to be credible and consistent throughout," while Sease's was not. He found that defendant had no guidelines for determining fault in single-car accidents and that, as a result, those decisions were left to each individual underwriter's judgment. He further found that Sease had not independently reviewed the circumstances surrounding the accident but had merely accepted the conclusion about fault that had been made by another, unidentified underwriter. Comparing the facts relating to the accident to an emergency, the ALJ reasoned

that because the accident was unforeseeable, unavoidable, and caused by black ice on the roadway, it should not be considered a chargeable "at-fault" accident. Rather, the ALJ specifically found that the accident "took place through no fault" of plaintiff. The ALJ therefore ordered that the five points be rescinded.

The Commissioner of the Department issued his final decision on May 17, 2005. The Commissioner accepted all of the ALJ's factual findings, but rejected his legal conclusion. Instead, the Commissioner reasoned that a single-car accident can be deemed "at-fault" for insurance rating purposes, regardless of the driver's culpability, as long as the criteria set forth in the applicable regulation, *see N.J.A.C.* 11:3–34.3, are met. The Commissioner explained:

> Pursuant to *N.J.A.C.* 11:3–34.3, an accident is an "at-fault accident" for which eligibility points should accrue if it: involved a driver insured under the policy; resulted in payment of a claim of $500 or more for accidents that occurred before June 9, 2003, or $1,000 or more, for accidents that occurred on or after June 9, 2003 . . . which payment was not recouped from another tortfeasor; is not specifically excepted as set forth in the rule; and the driver is not excused by application of the proportionate responsibility standard.

The Commissioner therefore concluded that defendant had properly deemed the accident to be an "at-fault" accident and upheld defendant's decision to decline to renew plaintiff's policy.

Plaintiff appealed and, in a published decision, *Reilly v. AAA Mid–Atlantic Ins. Co.*, 390 *N.J.Super.* 496, 915 *A.*2d 1105 (App. Div.2007), the Appellate Division affirmed. Reasoning that because the enabling statute, *N.J.S.A.* 17:33B–14, which authorized the Department to create a rating schedule for "at-fault accidents," did not specifically define "at-fault," the court concluded that the Legislature's intent was that the Department would promulgate regulations that clarified and defined "at-fault" accidents. *Reilly, supra,* 390 *N.J.Super.* at 503–04, 915 *A.*2d 1105. Turning to an analysis of the Department's regulation, *N.J.A.C.* 11:3–34.3, the Appellate Division concluded that the regulation is ambiguous because it defines an "at-fault accident" in the context of multi-vehicle collisions but is silent with regard to single-car accidents. *Reilly, supra,* 390 *N.J.Super.* at 504–05, 915 *A.*2d 1105.

The Appellate Division then considered whether the Department's construction of the regulation could nevertheless be affirmed. Finding that the legislative history of the enabling statute, *N.J.S.A.* 17:33B–14, evidenced an intention to prevent "good" drivers from having to subsidize the insurance rates for "bad" drivers, the court concluded that the Department could interpret that statute to permit it to utilize underwriting, rather than fault-based or negligence, concepts for assigning points for insurance rating purposes. *Reilly, supra,* 390 *N.J.Super.* at 506, 511–12, 915 *A.*2d 1105. Coupling that analysis with the court's usual deference to an agency's interpretation of its regulations, the appellate panel affirmed the Department's decision to permit defendant to assess points against plaintiff based on its classification of his one-car accident as an "at-fault" event. *Id.* at 510–12, 915 *A.*2d 1105.

## II.

On appeal, plaintiff urges us to reject the Department's definition of "at-fault" as a "secret, unwritten" rule because it authorizes the use of an actuarial risk standard rather than the statutorily adopted comparative negligence standard for fault and, therefore, for the assessment of insurance rating points. He contends that we should interpret the statute and the regulation as being based on the application of negligence concepts rather than authorizing the use of actuarial or underwriting concepts. Moreover, he argues that there is no evidence in the record or in the legislative history relating to the adoption of the statute or the regulation that supports the conclusion that a driver who is blameless in a single-car accident actually presents a higher insurance risk. Finally, plaintiff contends that in light of the unrebutted finding of the ALJ that he was not negligent, the suggestion in the Appellate Division's decision to the contrary is baseless and should be rejected by this Court.

The Department argues that the Appellate Division applied the appropriate standards to the matters before it in its interpretation of the statute, including the court's deference to the Department's

administrative expertise and its evaluation of insurance risks. The Department also contends that the regulation compels the conclusion that plaintiff was in fact "at-fault" because he bears proportionate responsibility for the event as the regulation defines it. Further, the Department asserts that the interpretation of the statutory language to permit consideration of actuarial risk is both reasonable and entirely consistent with the purpose of the statute. Finally, the Department urges us to reject plaintiff's argument that the regulation's language itself establishes a general negligence standard. Rather than imputing a negligence concept, the regulation's proportionate responsibility standard merely excuses one driver in a multi-vehicle accident because of another driver's negligence. As such, the Department argues that the regulation has no relevance to single-car accidents.

Amicus curiae Property Casualty Insurance Association of America (PCIAA) concurs with the position taken by the Department. Pointing out that the "at-fault" regulation includes six specific exemptions, none of which applies to plaintiff's single-car, weather-related crash, PCIAA argues that the Department intentionally excluded such incidents from being classified as not "at-fault." Moreover, PCIAA argues that the statute itself does not imply that "at-fault" should be equated with negligence and that even if plaintiff was not negligent, his behavior was sufficiently risky that the insurer should be permitted to rely upon it to decline to continue to afford him coverage. Interpreting the rule to assign automatic fault to the driver of the vehicle in a single-car accident, according to PCIAA, is both rational and reasonable. Finally, sounding a generalized, policy-based warning that permitting plaintiff to prevail might result in increased insurance rates, PCIAA urges us to defer to the Department's expertise, and to affirm the Appellate Division's judgment.

## III.

This matter requires us to consider whether plaintiff's single-car, weather-related accident is appropriately considered to be an

"at-fault" event within the meaning of the statute, *N.J.S.A.* 17:33B–14, or the regulation promulgated by the Department, *N.J.A.C.* 11:3–34.3. Central to this inquiry is the question of whether fault in this context is defined in negligence terms or in accordance with actuarial or underwriting concepts.

## A.

Before we address those questions, however, we are con¬ strained to consider briefly whether, as defendant has argued, plaintiff's appeal is moot. As the Appellate Division recognized, the points assigned to plaintiff have now expired and can have no effect on his eligibility for insurance in the future. *See Reilly, supra,* 390 *N.J.Super.* at 502, 915 *A.2d* 1105. At the same time, he is not entitled to any affirmative relief for the denial of coverage even if he prevails, because the only regulation that would permit such a recovery was not promulgated until July 3, 2006, *see N.J.A.C.* 11:3–33.6(d), by which time these points had already expired, *see N.J.S.A.* 17:33B–13(f). Finally, the Department as- serts that it is in the process of amending the challenged regula- tion to provide clarity, suggesting that we need not address plaintiff's appeal.

In light of the fact that plaintiff is not entitled to any affirmative relief, his appeal is technically moot. We have often declined, however, to dismiss a matter on grounds of mootness, if the issue in the appeal is an important matter of public interest. *See Transamerica Ins. Co. v. Nat'l Roofing Inc.,* 108 *N.J.* 59, 64, 527 *A.2d* 864 (1987); *In re Application of Boardwalk Regency Corp. for a Casino License,* 90 *N.J.* 361, 367–68, 447 *A.2d* 1335 (techni- cally moot issue may be judicially reviewed when matter is of public interest), *appeal dismissed, Perlman v. Att'y Gen. of N.J.,* 459 *U.S.* 1081, 103 *S.Ct.* 562, 74 *L.Ed.2d* 927 (1982); *John F. Kennedy Mem'l Hosp. v. Heston,* 58 *N.J.* 576, 579, 279 *A.2d* 670 (1971), *overruled on other grounds by In re Conroy,* 98 *N.J.* 321, 351, 486 *A.2d* 1209 (1985). Because we have concluded that the questions raised in this appeal qualify as important matters of

public interest, we will address their merits notwithstanding the fact that the plaintiff can derive no relief as a result.

### B.

We have long recognized that the Legislature is empowered to delegate to an administrative agency the authority to promulgate rules and regulations interpreting and implementing a statute. *See N.J. Chamber of Commerce v. N.J. Election Law Enforcement Comm.*, 82 *N.J.* 57, 82, 411 *A.*2d 168 (1980). We have recently described this fundamental proposition as being "beyond peradventure." *T.H. v. Div. of Developmental Disabilities*, 189 *N.J.* 478, 490, 916 *A.*2d 1025 (2007). Regulations adopted by an agency pursuant to a legislative mandate are presumed to be valid. *In re Adoption of N.J.A.C. 7:26B*, 128 *N.J.* 442, 449, 608 *A.*2d 288 (1992); *see also In re N.J. Tpk. Auth. v. Am. Fed'n of State, County, & Mun. Employees, Council 73*, 150 *N.J.* 331, 351, 696 *A.*2d 585 (1997) (noting that interpretation of agency charged with enforcing statute is entitled to "substantial deference"). We will defer to an agency's interpretation of a statute unless it is "plainly unreasonable." *In re N.J. Tpk. Auth., supra,* 150 *N.J.* at 351, 696 *A.*2d 585.

The presumption of validity, however, is not without limits. We have cautioned that "if an agency's statutory interpretation is contrary to the statutory language, or if the agency's interpretation undermines the Legislature's intent, no deference is required." *Ibid.* (citing *GE Solid State, Inc. v. Dir., Div. of Taxation,* 132 *N.J.* 298, 306–07, 625 *A.*2d 468 (1993); *In re Adoption of N.J.A.C. 7:26B, supra,* 128 *N.J.* at 450, 608 *A.*2d 288). "Our deference does not go so far as to permit an administrative agency under the guise of an administrative interpretation to give a statute any greater effect than is permitted by the statutory language." *In re Adoption of N.J.A.C. 7:26B, supra,* 128 *N.J.* at 450, 608 *A.*2d 288.

As we have held, an agency may not, through adoption of regulations, "alter the terms of a legislative enactment or frustrate the policy embodied in the statute." *T.H.*, *supra*, 189 *N.J.* at 491, 916 *A.*2d 1025 (quoting *N.J. Chamber of Commerce*, *supra*, 82 *N.J.* at 82, 411 *A.*2d 168). If a regulation is "plainly at odds with the statute, we must set it aside." *In re Freshwater Wetlands Prot. Act Rules*, 180 *N.J.* 478, 489, 852 *A.*2d 1083 (2004). "As we have repeatedly stated, the judicial role is to ensure that an agency's action does not violate express and implied legislative intent." *T.H.*, *supra*, 189 *N.J.* at 491, 916 *A.*2d 1025 (citing *In re Freshwater Wetlands Prot. Act Rules*, *supra*, 180 *N.J.* at 489, 852 *A.*2d 1083; *In re N.J. Tpk. Auth.*, *supra*, 150 *N.J.* at 351, 696 *A.*2d 585; *In re Petitions for Rulemaking, N.J.A.C. 10:82-1.2 & 10:85-4.1*, 117 *N.J.* 311, 325, 566 *A.*2d 1154 (1989)).

We begin, then, with the statutory language in our effort to define its meaning and intent. The statute, *N.J.S.A.* 17:33B-14, currently provides, in relevant part:

The [C]ommissioner [of the Department] shall ... promulgate a schedule of automobile insurance eligibility points by rule or regulation adopted pursuant to the "Administrative Procedure Act." The schedule shall assess a point valuation to driving experience related violations and shall include assessments for violations of lawful speed limits within such increments as determined by the [C]ommissioner, other moving violations, and at-fault accidents. For the purposes of this section, an "at-fault accident," occurring before the effective date of P.L.2003, c. 89, means an at-fault accident which results in payment by the insurer of at least a $500 claim and for accidents occurring on or after the effective date of P.L.2003, c. 89, means an at-fault accident which results in payment by the insurer of at least a $ 1,000 claim ...; except that an at-fault accident shall not mean an accident occurring as a result of operation of any motor vehicle in response to a medical emergency if the operator at the time of the accident was a physician responding to the medical emergency.

[*Ibid.* (citations omitted).]

The statute was enacted in 1990 as part of the Fair Automobile Insurance Reform Act (FAIR Act), *L.* 1990, *c.* 8, now codified at *N.J.S.A.* 17:33B-1 to -64. At that time, the definition of an "at-fault" accident was expressed only in terms of the $500 payment by an insurer. In 1997, the Legislature amended the statute to refine the definition of an "at-fault" accident by specifically excluding any accidents resulting from a physician responding to a

medical emergency. *L.* 1997, *c.* 381. The statute was amended again in 2003 to increase the dollar threshold from $500 to $1,000. *L.* 2003, *c.* 89, § 64.

Although the statute does not define what the Legislature intended by its use of the term "at-fault," the very selection of the word "fault" in the statutory language arguably implies that the Legislature intended to embody the concept of negligent or blameworthy conduct. Certainly, choosing the term "fault," rather than a more neutral term relating to the happening of an accident, would so suggest. Nonetheless, the term in the statute is itself ambiguous, with the result that we must look further in our effort to discern the intent of the Legislature, and by extension, the limits, if any, on the Department's ability to enact regulations pursuant thereto.

In 1990, when our Legislature adopted the FAIR Act, it did so as part of its comprehensive effort to address the continuing automobile insurance crisis. The Legislature specifically explained, as part of the legislative findings and declarations, that it intended:

g. To provide a healthy and competitive automobile insurance system in this State, automobile insurers are entitled to earn an adequate rate of return through the ratemaking process.

h. To that end, the Legislature declares that it is in the public interest to:

. . . .

(5) create a new residual market mechanism in which insurers will share directly in the risk of insuring the "bad driver;"

(6) guarantee that "good drivers" secure motor vehicle insurance coverage in the voluntary market and control the apportionment of drivers in the residual market;

[*L.* 1990, *c.* 8 (codified at *N.J.S.A.* 17:33B–2).]

As explained by the Assembly Appropriations Committee statement that accompanied the bill, this aspect of the FAIR Act was based on a similar statute in Michigan that "require[d] automobile insurers to provide insurance in the voluntary market to 'good drivers' " and attempted to "provide express criteria defining an eligible person for coverage in the voluntary market." *L.* 1990, *c.* 8 (Assembly Appropriations Committee Statement, Statement to Assembly Bill No. 1).

The bill, according to the committee statement, rather than attempting to define "good drivers," instead explicitly listed those who were excluded from this group, and therefore those who would not be part of the voluntary coverage market. *Ibid.* Included among the categories of individuals excluded from the voluntary market were those "who within the preceding three-year period ha[ve] accumulated experience-related insurance eligibility points as determined under a schedule promulgated by the [C]ommissioner" of the Department. *Ibid.* The section of the bill that granted the Commissioner the authority to promulgate the point schedule, subsequently codified at *N.J.S.A.* 17:33B–14, therefore rested on the notion that one could identify and distinguish between "good" and "bad" drivers and accord them different rights concerning insurance availability.

That statutory provision specifically directed that the schedule of points, for eligibility purposes, "shall assess a point valuation to driving experience related violations," including violations for speeding and moving violations. *N.J.S.A.* 17:33B–14. Further, the statute directed that the schedule "shall include assessments for ... at-fault accidents." *Ibid.* The only additional explanation of what the Legislature meant by "at-fault" is derived from the reference to the requirement that such an accident would only be included as an "at-fault accident" if it also resulted in payment by the insurer of a specified minimum claim. *Ibid.*

In compliance with the statute's directive, the Commissioner promulgated regulations to explain the schedule of points and to identify how points would be assessed for insurance eligibility purposes. Those regulations, which are to date substantially unchanged, created a definition of "at-fault" based on both inclusive and exclusive criteria. In pertinent part, the definition includes the following language:

"At-fault accident" is any accident involving a driver insured under the policy:

1. Where a driver is proportionately responsible based on the number of vehicles involved. A driver is proportionately responsible if 50 percent responsible for an accident involving two drivers; if 33 ⅓ percent responsible for an accident involving three drivers, etc.; and

2. Which results in a total payment by the insurer of at least $500.00 for an accident occurring before June 9, 2003; or at least $1,000 for an accident occurring on or after June 9, 2003.

[*N.J.A.C.* 11:3–34.3.]

At the same time, the regulation includes six separate circumstances in which the insured's involvement in an accident is specifically excluded from the definition of "at-fault." In particular the regulation provides:

An at-fault accident shall not include the following:

1. Involvement in an accident in which the motor vehicle owned or operated by the insured or other driver insured under the policy was lawfully parked;

2. Involvement in an accident in which the motor vehicle was struck by a hit and run driver, if such accident was reported to the proper authorities within 24 hours;

3. Involvement in an accident in connection with which neither the named insured nor any other driver insured under the policy was convicted of a moving traffic violation and the owner or operator of another vehicle involved in such accident was so convicted;

4. For physical damage losses other than collision;

5. For an accident in which the motor vehicle was struck in the rear by another vehicle and a driver insured under the policy has not been convicted of a moving violation in connection with the accident; or

6. For an accident occurring as a result of operation of any motor vehicle in response to an emergency if the operator at the time of the accident was responding to the call to duty as a paid or volunteer member of any police or fire department, first aid squad or any law enforcement agency.

[*Ibid.*]

Although none of these situations applies to plaintiff, the list assists our analysis by illustrating the Department's understanding of the FAIR Act's meaning and intent.

This regulation was initially adopted under the Department's emergency rulemaking authority, with a limited period of effectiveness. It was simultaneously re-proposed as a new rule to be adopted in the regular course of rulemaking. To some extent, comments received and the Department's responses thereto during the notice and comment period preceding the concurrent emergency adoption and re-proposal are of assistance to us in our inquiry. In particular, several of the comments and responses focus on the "at-fault" definition, as follows:

COMMENT: Several commenters objected to the definition of an "at-fault accident" in *N.J.S.A.* 11:3–34.3 because it allows insurers to determine or assess fault.

RESPONSE: *Insurers have always made an assessment of fault for evaluating and settling liability claims and thus for underwriting and rating purposes.* The proposed new rules provide for the use of an objective criteria for this process.

. . . .

COMMENT: One commenter objected to the use of proportionate responsibility to determine fault. The commenter believes that this would be cumbersome to monitor, unfair to certain drivers, and would quickly fill up the assigned risk market. The commenter argued that the definition could result in several drivers being charged for an at-fault accident when they are not the primary cause of the accident. The commenter suggested that the definition be amended to charge points for an at-fault accident only to the driver determined to hold the greatest percentage of fault.

A second commenter suggested modifying the definition of an at-fault accident from ". . . for which the driver is at least proportionately responsible . . . to . . . for which the driver is more than proportionately responsible . . ." in addition to providing a definition of proportionately responsible. The revised definition removes any ambiguity and also makes it clear that no points would be assigned for an accident where equal fault was found.

RESPONSE: The Department believes that the definition proposed adequately defines an at-fault accident. The Department has determined that *if two people are found to be equally responsible for an accident, then they both warrant the accrual of points. Each person is to be held responsible for his or her behavior.* It is possible for two people to be each 50 percent responsible for a two-car accident.

COMMENT: One commenter requested that the rule clarify the types of accidents where "at-fault" (that is, negligence) does not apply. The commenter advised that under current practice, the following are not considered at-fault accidents: 1) accidents involving damage by contact with animals or fowl; 2) accidents involving physical damage limited to and caused by flying gravel or falling objects. The commenter further questioned if there is a standard that insurers use to determine fault. The commenter also questioned if this rule provides that standard.

RESPONSE: The Department agrees that the rule should include a list of the types of accidents where the driver is clearly not responsible and has revised this section accordingly. The proposed rule does not include the standard that insurers use to determine fault. *Insurers apply a negligence standard to determine fault.*

[22 *N.J.R.* 3847 (Dec. 17, 1990) (emphasis added).]

Each of these comments focused directly on the concepts that would be embodied in the definition of "at-fault." Each of the responses, significantly, includes references by the Department to

fault in the sense of culpability or negligence rather than solely in terms of ratemaking or underwriting.

Similarly, when the Department proposed to amend the regulation in 2003 to increase the "at-fault" threshold payment from $500 to $1,000, it continued to stress that its focus was on identifying and drawing a distinction between "good" and "bad" drivers. In addressing the social impact of the proposed amendments to the regulation, the Department commented:

> The enactment of these amendments will help ensure that good drivers do not pay for bad drivers by ensuring that good drivers pay rates reflective of the actual cost of insuring the vehicles they drive, and that bad drivers, that is, those with more eligibility points, pay rates reflective of the actual cost of insuring the vehicles they drive.
>
> . . . .
>
> The proposed amendments are expected to decrease premiums for good drivers, while increasing premiums for those insureds whose driving records indicate that they are higher risks based on the number of automobile eligibility points accumulated within the preceding three years.
>
> [35 *N.J.R.* 3260 (Jul. 21, 2003).]

The repeated references to "good" and "bad" drivers strongly suggest that the Department understood the Legislature's intent as we do, that is, as a conscious decision to import negligence and culpability concepts into the "at-fault" definition rather than to rely strictly upon underwriting concepts as the basis for its analysis.

## IV.

We need not address directly the question of whether the regulation exceeded the scope of the authority granted by the statute. On its face, the regulation only sets forth a method for determining whether the assignment of eligibility points will be permitted. It does not directly conflict with nor does it exceed, as written, the statute's grant of authority. It is written largely in words that embrace the negligence concepts expressed both by the Legislature and by the Department during the notice and comment period that preceded its adoption. The words "proportionately responsible" in and of themselves suggest that the

analysis is not simply one of counting the number of vehicles, but rather one of assigning responsibility, that is, fault, to each of the drivers involved. This is apparent because the regulation refers to the number of vehicles and requires a comparison of the insured driver's "responsibility" for the event with the number of vehicles involved. That being the case, there must be some evaluative mechanism for defining responsibility, apart from the number of vehicles, so as to undertake that comparison. In light of that comparative analysis, the determination about responsibility of the insured driver must derive from negligence, or fault in the sense of culpability, concepts.

Similarly, the regulation's specific list of accidents that will be excluded from the "at-fault" category suggests that the regulation includes concepts of fault in the sense of negligence. For example, the exclusion of an accident in which the vehicle was parked, or was the victim of a hit and run, or in which the driver of the other vehicle was convicted of a moving violation, or in which the driver's vehicle was hit in the rear under circumstances that did not lead to the driver's conviction of a moving violation, all include concepts of fault derived from ordinary negligence analysis. Although these same exemptions may also be supported by an underwriting analysis, nothing in the language of the statute or its legislative history and nothing in the language of the regulation or the history that surrounded its adoption suggests that the inquiry to be undertaken in that assignment of points flows from underwriting principles.

To be sure, there is a relationship between negligence principles and underwriting considerations. The responses by the Department during the notice and comment period suggest that the regulation was designed to create "objective criteria" to be used for "underwriting and rating purposes." 22 *N.J.R.* 3847 (Dec. 17, 1990). There is, however, nothing in the record that supports the conclusion that the evaluation of an accident for the purpose of assigning eligibility points is based solely on underwriting concepts. To the extent that the use of underwriting princi-

ples plays a role in the assignment of points, it cannot supplant the negligence-based concept embodied in the statute. That is to say, the statute is designed to reward "good drivers" and to distinguish them from "bad drivers" for purposes of making insurance available.

██  The intent of the Legislature in enacting the statute was not to identify "good" and "bad" based on an underwriter's evaluation of risk, but to embrace ordinary negligence concepts as the basis for that evaluation. The regulation, as originally adopted and as re-adopted, sought to create objective criteria on which to draw the distinction between "good" and "bad" and to translate those criteria into a part of an underwriting equation. The regulation indeed does so, by embracing the concepts of "responsibility" for an accident into the "proportionately responsible" matrix. The underwriting criteria follow from the analysis in the regulation; those criteria do not inform the analysis, for to do so would be to exceed the scope of the enabling statute.

The regulation does not directly define proportional responsibility as that concept relates to a single-car accident. To be sure, the Department could promulgate a regulation that would address that circumstance. Indeed, the Department could, consistent with the Legislature's intent, define "at-fault" for a single-car accident using a negligence-based standard other than the "proportionately responsible" criteria applied to multi-vehicle accidents. The Department, however, did not do so, but adopted the "proportionately responsible" standard to be applied to all accidents. On its face the regulation says that if the driver's "proportional responsibility" is less than the mathematical percentage attributed to the driver based on the number of vehicles, then the driver is not "at-fault." The plain import of the regulation, as currently worded, is that if a driver in a single-car accident is not one hundred percent "responsible" for the happening of the accident, he is not "proportionately responsible" and therefore not "at-fault" as the term is defined in the regulation.

Although the Department urges us to embrace its conclusion that plaintiff's single-car accident necessarily constituted an "at-fault" accident as defined by the regulation, it has not consistently followed that analysis. Indeed, in previous published decisions, the Commissioner has recognized the fact that negligence concepts play a role in the assessment of eligibility points, *see Amica Mut. Ins. Co. v. Kern*, 93 *N.J.A.R.*2d(INS) 55, 1993 WL 548379 (1993) ("proportionate responsibility ... standard was added to be consistent with the comparative negligence standard applied for tort responsibility, and to avoid penalizing drivers with additional premium charges when their contribution to the cause of an accident is negligible compared to other drivers"). Although previously concluding that a single-car accident may be deemed to be "at-fault" for eligibility purposes, *see Woo v. State Farm Ins. Co.*, 96 *N.J.A.R.*2d(INS) 99, 1996 WL 930938 (1996), the agency did so in circumstances in which the driver's fault also rested on the finding that she had been traveling at an unsafe speed. At the same time, when damage was caused in a single-car accident by a falling stone, the Department avoided the "at-fault" analysis by concluding that the event was not even a collision. *Geist v. Selective Ins. Co.*, 96 *N.J.A.R.*2d(INS) 75, 1996 WL 763254 (1996).

More recently, as our Appellate Division noted, the Commissioner has expanded the regulation's definition of "at-fault" in unpublished decisions, to an interpretation that is interchangeable with the insurance concept of a "chargeable" accident. *See Reilly, supra*, 390 *N.J.Super.* at 509–10, 915 *A.*2d 1105. Although the appellate panel interpreted this development as consistent with the regulation and the statute and thus entitled to our deference, we cannot avoid reaching the opposite conclusion. The recent decisions seeking to apply solely a ratemaking or underwriting analysis in place of the negligence or culpability driven focus of the statute and the regulation itself, however, so exceed the agency's statutory authority that they are entitled to no deference. *See In re Registrant M.F.*, 169 *N.J.* 45, 56, 776 *A.*2d 780 (2001); *In re N.J. Tpk. Auth., supra*, 150 *N.J.* at 351, 696 *A.*2d 585; *Serv.*

*Armament Co. v. Hyland,* 70 *N.J.* 550, 563, 362 *A.*2d 13 (1976) ("[A]n administrative interpretation which attempts to add to a statute something which is not there can furnish no sustenance to the enactment.").

## V.

In this record, there has been no challenge to the ALJ's factual findings. Nor, for that matter, is there even a hint of evidence to suggest that plaintiff was the sole cause of the accident. Notwithstanding the fact that he was the only driver, the regulation's plain wording compels the conclusion that he was not "at-fault" for the accident. In reaching the opposite conclusion, the Appellate Division relied on the testimony of the AAA underwriter and previous decisions made by the Department but not subjected to our scrutiny. Neither, however, withstands analysis. The opinion of the insurer's underwriter is entitled to no weight in our consideration of the meaning of the statute or the permissible scope of the regulation. More to the point, the previous decisions of the Department, although entitled to our deference because of the agency's expertise, cannot support an interpretation which exceeds the proper scope of the regulation.

Plaintiff's single-car accident, as a matter of fact, was not his fault. His single-car accident was not, as a matter of fact, one for which he was proportionately responsible. The decision by the insurer to apply underwriting concepts to the assignment of points was not permitted by the regulation. The Department's determination that the regulation not only includes but is governed by an analysis of underwriting rather than negligence-based fault concepts was inconsistent with the plain wording of the regulation and expands the scope of the regulation beyond the authority granted by the statute.

## VI.

The judgment of the Appellate Division is reversed.

Justice RIVERA–SOTO, dissenting.

As defined by the majority, this case involves a simple issue: "whether, and under what circumstances, a driver who is involved in a single-vehicle accident may be considered to be 'at-fault' for purposes of assessing insurance eligibility rating points." *Ante* at 487, 946 *A.*2d at 567. Because, after full briefing and argument, that issue does not strike me as worthy of consideration on a petition for certification, and because I am of the view that the analysis, reasoning, and conclusions reached by the Appellate Division were correct, I respectfully dissent.

Certification should be granted only in limited instances. *Rule* 2:12–4 lays out clearly the high hurdle a petition for certification must vault in order to justify Supreme Court review:

> Certification will be granted only if the appeal presents a question of general public importance which has not been but should be settled by the Supreme Court or is similar to a question presented on another appeal to the Supreme Court; if the decision under review is in conflict with any other decision of the same or a higher court or calls for an exercise of the Supreme Court's supervision and in other matters if the interest of justice requires. *Certification will not be allowed* on final judgments of the Appellate Division *except for special reasons.*
> [ (Emphasis supplied).]

This appeal presents unique and idiosyncratic events arising out of a weather-related, single-automobile accident. Full consideration of this appeal discloses, however, that it does not present "a question of general public importance[;]" it does not present a "conflict with any other decision of the same or a higher court[;]" it does not present an instance that "calls for an exercise of the Supreme Court's supervision[;]" it does not present a case that should be reviewed because "the interest of justice requires[;]" and it does not present any "special reasons." In light of the foregoing, certification of this appeal should be vacated as improvidently granted.

Even if this appeal satisfied the standards for certification, I nonetheless disagree with the majority on the substantive merits of this appeal and, thus, would affirm the judgment of the Appellate Division substantially for the reasons Judge Reisner so ably

set forth. *Reilly v. AAA Mid–Atlantic Ins. Co. of N.J.*, 390 *N.J.Super.* 496, 915 *A.*2d 1105 (App.Div.2007).

I therefore respectfully dissent.

*For reversal*—Chief Justice RABNER and Justices LONG, ALBIN, WALLACE, and HOENS—5.

*For dismissal*—Justice RIVERA–SOTO—1.