NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2515-24

IN THE MATTER OF STATE
OF NEW JERSEY,

    Respondent-Appellant,

and

COUNCIL OF NEW JERSEY
STATE COLLEGE LOCALS, AFT,

    Petitioner-Respondent,

and

COMMUNICATIONS WORKERS
OF AMERICA, AFL-CIO,

    Intervenor-Respondent.

_____

> **APPROVED FOR PUBLICATION**
>
> **April 17, 2026**
>
> **APPELLATE DIVISION**

Submitted March 10, 2026 – Decided April 17, 2026

Before Judges Sumners, Susswein and Augostini.

On appeal from the New Jersey Public Employment Relations Commission, PERC Nos. 2012-017, 2016-029, 2016-031, 2019-018, 2019-024, and 2020-003.

Jennifer Davenport, Attorney General, attorney for appellant (Donna Arons, Assistant Attorney General, of counsel; Kevin K.O. Sangster, Deputy Attorney General, on the briefs).

Weissman & Mintz LLC, attorneys for respondent Council of New Jersey State College Locals, AFT (Kevin McGovern, of counsel and on the brief).

Weissman & Mintz LLC, attorneys for respondent Communications Workers of America, AFL-CIO (Patricia A. Villanueva, of counsel and on the brief).

Christine Lucarelli-Carneiro, General Counsel, attorney for respondent New Jersey Public Employment Relations Commission (Frank C. Kanther, Deputy General Counsel, on the brief).

The opinion of the court was delivered by

SUMNERS, JR., C.J.A.D.

The State of New Jersey challenges the final agency decision of the Public Employment Relations Commission (PERC) that twenty-eight employees working in eleven positions at Kean University, Montclair State University, and The College of New Jersey (TCNJ), can be members of collective bargaining units — The Council of New Jersey State College Locals (AFT) or the Communications Workers of America (CWA) (collectively unions). In deciding the unions' clarification of unit petitions, PERC determined the employees can be union members because their job duties do not satisfy the managerial executive exception which precludes union membership for "persons who formulate management policies and practices" and have "the responsibility of

directing the effectuation of such management policies and practices." N.J.S.A. 34:13A-3.

We reject the State's contentions that PERC erred in: (1) determining the job titles do not satisfy the managerial executive exception because they "are [not] charged with the responsibility of directing the effectuation of such management policies and practices"; and (2) interpreting the Employer-Employee Relations Act (EERA), N.J.S.A. 34:13A-1 to -64, to require that managerial executives who formulate policies without independent review from others can join the unions. We conclude PERC's ruling is not arbitrary, capricious, or unreasonable because it is consistent with the record and the applicable law.

I.

A. THE DISPUTE

The genesis of this dispute began in 2012, when the AFT, which represents collective bargaining units in New Jersey state colleges and universities, filed a clarification of unit petition with PERC seeking to include various job titles in their union. See N.J.A.C. 19:11-1.5. The petition followed a 2010 amendment to N.J.S.A. 34:13A-3, which narrowed the definition of "managerial executive"

for non-State public employers.[1]  State v. Council of N.J. State Coll. Locals, AFT, No. A-2987-12 (App. Div. Feb. 20, 2015) (slip op. at 2).  CWA, which

---

[1] Prior to the 2010 amendment, N.J.S.A. 34:13A-3 read:

> "Managerial executives" of a public employer means persons who formulate management policies and practices, and persons who are charged with the responsibility of directing the effectuation of such management policies and practices, except that in any school district this term shall include only the superintendent or other chief administrator, and the assistant superintendent of the district.
>
> [N.J.S.A. 34:13A-3(f) (1974) (amended 2010).]

The 2010 amendment stated:

> "Managerial executives" of a public employer, in the case of the State of New Jersey, means persons who formulate management policies and practices, but shall not mean persons who are charged with the responsibility of directing the effectuation of such management policies and practices, except that, in the case of the Executive Branch of the State of New Jersey, "managerial executive" shall include only personnel at or above the level of assistant commissioner.
>
> In the case of any public employer other than the State of New Jersey, "managerial executives" of a public employer means persons who formulate management policies and practices, and persons who are charged with the responsibility of directing the effectuation of such management policies and practices, except that in

4

represents "the administrative and clerical, professional, primary level supervisory, and higher-level supervisory units" in New Jersey state colleges and universities, intervened to include additional employees in its union based on the definition of non-State public employers.

In a January 31, 2013 decision dismissing the unions' petition, PERC, citing N.J.S.A. 18A:64-20 and 18A:64-21.1, determined: (1) college staff and professionals were not State employees, but rather "employees of the respective boards of trustees of the various state colleges"; (2) the amended definition of "managerial executives" did not apply to those employees who held positions in the submitted job titles; and (3) the amendment did not alter the status of these employees who previously had been excluded as managerial executives. The unions appealed.

We held the 2010 amendment's definition of managerial executives of State public employers did not apply to state college and university employees. Ibid. Concluding that the statute was unambiguous, we reasoned that a college

any school district this term shall include only the superintendent or other chief administrator, and the assistant superintendent of the district.

[N.J.S.A. 34:13A-3.]

or university's board of trustees employs its faculty and staff, whereas the Governor employs our state public employees per the EERA, such as for negotiations. Ibid. Because the unions' clarification of unit petitions did not involve negotiations, we applied the definition of managerial executives for non-State public employers. Ibid. As to whether the employees were managerial executives, we remanded for PERC to determine if their job titles could be represented by the unions after "conduct[ing] a thorough fact-finding investigation, with a hearing, in accordance with its regulations." Id. at 8.

B. PERC DIRECTOR OF REPRESENTATION'S DECISION

On remand, after PERC staff conducted numerous conferences and hearings over several years to determine the job titles that can be represented by the unions, the PERC Director of Representation (Director) selected a group of employees from Kean University, Montclair State University, and TCNJ for his first-round decision. After reviewing the parties' submissions, the Director reasoned that there were no substantial disputed material facts warranting an evidentiary hearing and conducted an administrative investigation. N.J.A.C. 19:11-2.2 and -2.6.

On April 30, 2024, the Director issued a ninety-nine-page decision finding that twenty-eight employees, with seventeen job titles, should be included in the

A-2515-24

unions because the job duties do not qualify for the managerial executive exception, and that one job title—Executive Director of Residence Life at Montclair State University—is a managerial executive position and excluded from union membership.

For the sake of brevity, we highlight the Director's relevant findings regarding the applicability of the managerial executive exception to the following job titles[2] which are in dispute:

a. Kean University

1. Associate Director for Student Research & Innovation (Director III)

- Ensures that student research complies with relevant university, state, and federal regulations and provides resources for students.

- This includes managing all student research award programs; creating and managing summer research programs; and educating faculty on engaging with students in their research.

- As part of the Kean University Institutional Review Board (IRB), reviews and approves IRB applications; makes "recommendations on human subject protection policies"; and engages in "research integrity reviews."

- Reviews faculty/student research; researches proposals and awards funds; and drafts

---

[2] The Director identified the individuals employed in the job titles. We do not do so as we focus only on the job titles and their duties.

department procedures for "industry best practices."

- Recommends the creation and implementation of policies to the Vice President of Research and the Provost.

- The Director determined the State failed to show that job duties were "not subject to further independent review." The Director found that the position's involvement with employee grievances was "informal at a low level" and did not carry significant discretion. The Director further noted that the State did not provide "sufficient detail of any specific instances of [the Director III's] recommendations for personnel actions."

2. Managing Assistant Director

- Duties include creating and overseeing the implementation of strategic marketing plans for performing arts programs; supervising marketing support staff; managing audience cultivation; increasing visibility for arts programming; overseeing safety protocols for the "safety rider" program (which escorts students who feel unsafe on campus); and overseeing COVID protocols.

- Reports to the Executive Director of the Office of Theatre Management and Programming on all marketing and public relations matters concerning the school's performing arts. The Executive Director approves the Managing Assistant Director's decisions to form and implement procedures.

- The Director determined the Managing Assistant Director's decisions were subject to further

independent review. For instance, the position's supervisory duties were "limited to scheduling and directing work" and were unable to make personnel decisions "without the independent review of co-managers, higher-level managers, or committees." Finally, the involvement with grievances was "informal at a low level."

3. Managing Assistant Director II (Production Supervisor)

- Duties include managing the recruitment and training of all staff in safely using equipment and audio, video, and lighting systems; supervising stage management's work; and supervising performances and troubleshooting issues. In addition, duties include "primary oversight of technical aspects of each event hosted by the [Executive Director of the Office of Theatre Management and Programming]"; "budgetary responsibilit[ies]" for each event; negotiating requirements for "technical riders"; negotiating prices for rentals of additional equipment; budget planning; and managing production codes.

- Prepares employee corrective action memos, performance improvement plans, and formal referrals for disciplinary action to human resources but may not unilaterally discharge AFT unit members.

- Reports to the Executive Director of the Office of Theatre Management and Programming on budgeting issues, venue requests, staffing or production issues. Reappointment recommendations of staff are subject to the Executive Director's review.

A-2515-24

- The Director noted that although the State initially raised the managerial executive exception before the cases were consolidated, it did not raise this issue before the Director finalized the list of selected employees. Even if considered on the merits, the Director determined that a "substantial supervisory conflict of interest" did not exist and that the State waived its managerial executive argument by not raising the issue before the Director when the lists were finalized. Even if the issue was not waived, the Director noted that the Managing Assistant Director II was not a managerial executive position because its formulation of policies "w[as] subject to further independent review and approval by others."

b. TCNJ

1. Director of Development and Planned Giving

- Duties include identifying and soliciting "major and planned gifts"; creating research strategies; developing and maintaining a planned giving program; supervising Annual Fund staff members; and coordinating with financial institution representatives.

- Does not evaluate AFT or CWA unit staff members' performance and is not involved in the grievance process; reports issues to supervisor.

- The Director found that the State failed to show the position had the discretion to decide or recommend personnel actions or provide examples of directing policy without independent review from others.

10

2. Leadership Gift Officer and Major Gift Officer

- Duties include "developing and implementing strategies to identify and solicit potential leadership gift donors[;] drafting and negotiating gift agreements[;]" "providing appropriate recognition and stewardship of the donor/gift[;]" and complying with TCNJ gift policies.

- The Director found the position did not include managerial executive duties because it did not authorize implementation of policy without independent review from others.

c. Montclair State University

1. Assistant Director for Residence Life and Facilities

- Duties include coordinating and maintaining repair of residential facilities; proposing long-term improvements; troubleshooting issues with the administration; developing the budget; and recommending policy changes. Formulation of policies is subject to review and approval by Associate Director of Housing Services and Executive Director of Residence Life.

- The Director found the State waived its argument regarding the managerial executive exception and even if not waived, the position did not include managerial executive duties because it did not authorize implementation of policy without independent review from others.

2. Assistant Director of Residence Life

- Duties include supervising community directors in the AFT's unit, senior clerk transcribers in the

11

CWA unit, and indirectly supervising graduate student assistant community directors and undergraduate student staff members. Reports to the Associate Director of Residence Life.

- Serves on an emergency response rotation to provide guidance on university guidelines and protocols, and as a conduct and appeal officer for violations of student conduct. Develops student staff evaluation systems; reviews policies and ensures that staff are properly implementing policies; oversees the budget for training, development, and recruitment. While on call, exercises "a high degree of independent discretion to adjust responses in real time depending on the facts of each incident, although they can call up the chain of command for guidance." Has the authority to hire, discipline, and fire employees after consulting with Human Resources and the Vice President/Unit head.

- The Director noted that the State waived its arguments regarding the managerial executive exception. Even if considering the merits, the Director determined that as to one of the three individuals working in the position, the State failed to produce evidence establishing that they created policy. As to the two others, the Director found there was "no indication that the Assistant Directors alone determined the plan without independent judgement from others." He also noted the position had no independent discretion over any policy and did not involve "the thoughtful consideration and forward-planning of longer-term policy to be followed by others that will not simply be adjusted with discretion by another employee of the same level the next

day" that would fall under the managerial executive exception.

3.  <u>Associate Director of Residence Life</u>

- Duties include overseeing departmental training programs; implementing departmental hiring; reviewing residential conduct incident reports; drafting departmental policies; and serving on the "manager after-hours emergency on-call rotation" to provide guidance on serious incidents and emergencies.

- Reports to the Executive Director of Residence Life, Associate Dean of Students, and Director of Student Conduct on "high-level conduct cases," suspensions expulsions, policy updates, and conducts related trainings.

- Supervises and evaluates three managers and a CWA unit member and indirectly supervises eight AFT unit members and one CWA unit member.

- The Director found that the State waived its arguments regarding the managerial executive exception. Even if considered on the merits, the Director determined the position did not decide or recommend actions "without independent review and judgment from others" and formulation of policies was limited to "implement[ing] the general strategies and directives of higher-level supervisors," which did "not constitute directing the effectuation of policy."

13

4. <u>Associate Director of the Center for Research and Evaluation on Education and Human Services (CREEHS)</u>

- Duties include communicating current research and evaluation trends to other staff members and presenting research results to staff members.

- Not involved in the grievance process and does not have the power to review and submit evaluations of staff members; participates in search committees to fill positions; and advises supervisory staff who are facing discipline.

- The Director found that the State waived its arguments regarding the managerial executive exception. Even if considered on the merits, the Director determined that the State's certifications established that the position's formulation of policies was subject to approval by the CREEHS Director and the CREEHS leadership team thereby disqualifying it from the managerial executive exception.

5. <u>CREEHS Director</u>

- Duties include responsibility for CREEHS' day-to-day operations; securing funding; drafting research; writing reports; "leading the staff of researchers and evaluators in procuring contracted work;" engaging with stakeholders across the state; hiring and evaluating staff; and representing CREEHS.

- The Director found there was no evidence the position "made a recommendation for a personnel action, let alone that such a recommendation would have been effective without independent review and judgement from others" and had

14

A-2515-24

informal involvement in employee grievances. Further, the position did not include managerial executive duties because it did not independently recommend policies or personnel actions without independent review from others.

6.  Senior Research Associates at CREEHS

    - Duties include designing and overseeing research studies and working with graduate students and research assistants on their research.

    - No power to review or submit evaluations for employees.

    - The Director found that the State waived its arguments regarding the managerial executive exception. Even if considered on the merits, the managerial executive exception was inapplicable as the position did not have the discretion to formulate policy on its own.

7.  Director of Red Hawk Central, the Financial Aid Center

    - Duties include creating policies regarding financial services and retention of students; overseeing the phone and live chat system that allows the Center to communicate with students; and working with managers in effective implementation of policies.

    - Reports to the Vice President of Enrollment Management to develop policies regarding enrollment and registration and has implemented policies ranging from how the Office of the Registrar receives forms to students' compliance with immunization requirements.

15

- The Director reasoned that the managerial executive exception does not apply because the position does not formulate policy without independent review from others.

## C. APPEAL OF THE DIRECTOR'S DECISION

On July 11, 2024, PERC denied the State's request to stay the Director's decision, reasoning the State failed to analyze the Crowe[3] factors and thus did not show how a stay would prevent irreparable harm.

On January 30, 2025, PERC affirmed the Director's decision.[4] PERC initially noted:

> [T]he State has raised a substantial question of law concerning the interpretation of the [EERA] in terms of how to apply the [EERA's] managerial, supervisory, and confidential employee exemptions to titles that the majority representatives for certain statutorily defined statewide units seek to include in their respective units pursuant to N.J.S.A. 34:13A-5.10.

PERC also rejected the State's contention that the clarification of unit petitions was untimely and waived. PERC found that no law or regulations prescribed a time limit to filing a clarification of unit petition and the unions did

---

[3] Crowe v. DeGioia, 90 N.J. 126, 132-34 (1982).

[4] We omit any reasoning that the confidential employee exception applied to certain positions because the State does not challenge this issue on appeal.

not waive their claims to represent the job titles. As for the managerial executive exception, PERC maintained it "strictly construes [the] asserted exclusions to an employee's eligibility for representation by a majority representative" because the EERA's public policy favors including all employees interested in collective negotiations. See State of N.J. and CWA, P.E.R.C. No. 86-18, 11 N.J.P.E.R. ¶ 16179, 1985 WL 1145539 (1985).

PERC determined the Director "thoroughly considered" the State's evidence regarding the employees' job duties and properly determined the employees did "not exercise sufficient levels of independence in formulating or directing the effectuation of management policies and practices" to be considered managerial executives.[5] PERC found the Director did not apply an unduly restrictive definition of managerial executive but correctly applied N.J.S.A. 34:13A-3(f) and the three-factor analysis pronounced in N.J. Tpk. Auth. v AFSCME, Council 73, 150 N.J. 331, 356 (1997), in considering "(1) the relative position of that employee in [the] employer's hierarchy; (2) [the employee's] functions and responsibilities; and (3) the extent of discretion [the

_____

[5] PERC disagreed with the Director's inclusion of the Director III position in the AFT negotiating unit, reasoning it was confidential and should thus be excluded from AFT membership.

employee] exercises," when determining either the formulation policy or directing the effectuation of policy. PERC found that the Director's findings were supported by the agency's precedent that a managerial executive must implement policies without independent review from others and that "managerial authority that is circumscribed by existing policies or requires deferral to a superior for non-routine matters may be insufficient for managerial executive status."

## II.

Our review of a final agency decision is well settled. We consider the decision presumptively valid, Reilly v. AAA Mid-Atlantic Ins. Co. of N.J., 194 N.J. 474, 485 (2008), deferring to the "agency action that purports to effectuate statutory and regulatory authority," Brady v. Dep't of Pers., 149 N.J. 244, 256 (1997).[6] We will only reverse or modify the decision if it is arbitrary, capricious,

---

[6] Our Supreme Court has not yet decided whether our deference to agency decisions should track Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412-13 (2024). See In re P.T. Jibsail Fam. Ltd. P'ship, ___ N.J. ___ (2026) (slip op. at 6) (noting that New Jersey courts have "not always been consistent about what standard of review applies to an agency's interpretation of a statute it is charged with enforcing" and explaining that it would not attempt to reconcile New Jersey case law with Loper Bright because the case could be decided on other grounds). There, the United States Supreme Court overruled Chevron deference and required that courts exercise "independent judgment" in assessing whether to defer to agency interpretations of law. Loper Bright, 603 U.S. at 412-13.

or unreasonable, or violates legislative policies expressed or implied in the statutory scheme administered by the agency. In re Musick, 143 N.J. 206, 216 (1996). Our deference is grounded in recognizing the "agency's expertise and superior knowledge of a particular field." In re Carter, 191 N.J. 474, 483 (2007) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). Deference does not apply to the agency's interpretations of questions of law, and "if substantial evidence supports the agency's decision, 'a court may not substitute its own judgment for the agency's even though the court might have reached a different result.'" Ibid. (quoting Greenwood, 127 N.J. at 513).

### III.

The essence of the State's appeal is that PERC's decision is novel and contrary to the definition of managerial executives set forth in Turnpike Authority.[7] Specifically, the State contends that PERC did not correctly apply the Turnpike Authority factors, only focusing on whether the positions had the discretion to decide policies without independent review from others. The State maintains that, without statutory support, and contrary to Turnpike Authority – – "the only judicial decision interpreting the . . . managerial executive definition" — PERC "required that to be a managerial executive the employee

---

[7] The State does not challenge the Director's decision to not conduct a hearing.

'must independently decide or effectively recommend policies or procedures without independent review from others.'" PERC failed to analyze how the positions made recommendations that "effectively control[led]" the college or universities' policies. The State asserts that collaboration with superiors should not exclude these positions from the managerial executive exception to union membership. We conclude that neither the record nor the law supports these contentions.

Managerial executives for public employers other than the State are "persons who formulate management policies and practices, and persons who are charged with the responsibility of directing the effectuation of such management policies and practices." N.J.S.A. 34:13A-3. In the seminal Turnpike Authority decision, which was based on PERC's ruling in Borough of Montvale, P.E.R.C. No. 81–52, 6 N.J.P.E.R. ¶ 11259, 1980 WL 603380 (1980), our Supreme Court defined a managerial executive as:

> A person formulates policies when he [or she] develops a particular set of objectives designed to further the mission of [a segment of] the governmental unit and when he [or she] selects a course of action from among available alternatives. A person directs the effectuation of policy when he [or she] is charged with developing the methods, means, and extent of reaching a policy objective and thus oversees or coordinates policy implementation by line supervisors. Whether or not an employee possesses this level of authority may

generally be determined by focusing on the interplay of three factors: (1) the relative position of that employee in his [or her] employer's hierarchy; (2) his [or her] functions and responsibilities; and (3) the extent of discretion he [or she] exercises.

[150 N.J. at 356 (quoting Borough of Montvale, 1980 WL 603380).]

Our Court held PERC's prior definition—that a managerial executive "possess and exercise a level of authority and independent judgment sufficient to affect broadly the organization's purposes or its means of effectuation of these purposes"—was "unduly restrictive" and noted managers may have significant discretion within their departments and not broadly affect the organization's purposes. Ibid. Thus, the Court reasoned that PERC's definition should serve as an example of a managerial executive, not "a condition of exclusion." Ibid.

After Turnpike Authority, PERC further clarified the managerial executive exception. The agency held that an

employee need not be at the top of an organization to be a managerial executive. But the higher an employee is in the hierarchy and the fewer levels of decisional review, the more likely it is that the employee has authority to formulate or direct the effectuation of management policies and practices.

[In re State (State I), P.E.R.C. No. 99-59, 25 N.J.P.E.R. ¶ 30021, 1998 WL 35395858 (1998).]

Additionally, "[a] managerial executive need not have final responsibility for signing off on policies, provided [their] recommendations effectively [determine] what policies will be adopted by [setting] . . . key components." Ibid.

PERC has also applied the second and third Turnpike Authority factors to different situations. As to the second factor of analyzing job duties, the agency ruled a managerial executive must exercise a "greater degree of authority and accountability" than a supervisor or professional employee. State I, 1998 WL 35395858. Supervisory duties such as planning, assigning work among staff, and making "immediate judgment[s]" on an "individual day-by-day basis as to whether or not a work product has been fulfilled" does not establish managerial executive status. Ibid. Additionally, the agency found that managerial executives must have policy planning responsibilities that are long-term, rather than short-term decisions, such as developing forms to address immediate issues. See City of Newark, D.R. No. 2024-3, 50 N.J.P.E.R. ¶ 36, 2023 WL 6372713 (2023). Finally, managerial executives must not defer to higher authority on non-routine matters. See In re State (State II), P.E.R.C. No. 99-60, 25 N.J.P.E.R. ¶ 30022, 1998 WL 35395859 (1998) (finding that chief and assistant investigators were not managerial executives because they were

required to defer to the regional office deputy on non-routine matters such as requesting experts, suspending investigations, and changing investigative procedures).

Regarding the third factor of analyzing the exercise of discretion, the agency ruled: (1) an employee is not a managerial executive without "independent decision-making authority over the formulation and implementation of employer policies," In re Camden Hous. Auth., D.R. No. 2014-7, 40 N.J.P.E.R. ¶ 84, 2013 WL 6157296 (2013), and (2) a municipal housing liaison was not a managerial executive because although he made policy recommendations to the township's affordable housing committee, the recommendations were subject to review and approval by the township and were not "rubber-stamped by management," In re Twp. of Hopewell, D.R. No. 2011-14, 38 N.J.P.E.R. ¶ 48, 2011 WL 5176850 (2011).

Furthermore, PERC has applied consistent reasoning when determining if college and university employees are managerial executives. See In re Burlington Cnty. Coll., 31 N.J.P.E.R. ¶ 150, 2005 WL 6711499 (2005) (finding that International Program Specialists were not managerial executives because they ensured compliance with federal guidelines rather than effectuate policy); In re State (Montclair State Univ.), D.R. No. 2018-15, 44 N.J.P.E.R. ¶ 70, 2018

A-2515-24

WL 774409 (2018) (finding that assistant and associate directors were not managerial executives because they occupied "relatively low positions" within the administrative hierarchy).

PERC adopted the Director's findings that, based upon conferences, hearings, and investigations, the managerial executive exception did not apply to the disputed positions except for the Director III position at Kean University which PERC determined was confidential. As noted, the Director found that the jobs in question were relatively low positions in the administrative hierarchy, the duties were centered on management and/or implementation of policies, and the employees in those positions did not exercise significant discretion in formulating policies. The Director also found that the State waived its arguments regarding the managerial executive exception for ten positions because it failed to raise this claim before the Director finalized the lists of selected positions.[8] Even if not waived, the State did not present sufficient

---

[8] PERC did not address this issue in its decision. Instead, it addressed and rejected the State's argument that the union waived its ability to challenge the placements by filing untimely petitions.

evidence showing that the ten positions created policy without independent review.[9]

Given our consideration of the governing law and the clarity of the record before PERC, we see no basis to conclude that PERC's decision should be upset because it is arbitrary, capricious, or unreasonable. The State has not shown that PERC's reliance on the Director's findings regarding the scope of the job duties is misplaced because they are inaccurate. Applying the Turnpike Authority factors and the agency's rulings interpreting that decision, PERC properly determined the Director considered the positions' placement in the hierarchy, job responsibilities, and "level[] of independent oversight and review by superiors." PERC correctly found that the positions do not qualify as managerial executive because they do not formulate and effectuate their employers' policies without independent review from superiors.

---

[9] Although the State did not challenge waiver in its initial merits brief, it argued in its reply brief that since the Director considered its substantive arguments regarding the Associate Director of Residence Life and Associate Director of the CREEHS positions, those arguments were not waived. However, the State did not address waiver regarding other positions at Montclair State University: Assistant Director for Residence Life and Facilities at Montclair, Assistant Directors of Residence Life, Senior Research Associates at CREEHS.

A-2515-24

PERC's reasoning also aligns with the EERA's purpose that public policy favors including public employees in collective negotiations and PERC should therefore strictly construe purported exclusions to eligibility. See Tpk. Auth., 150 N.J. at 352-55; State v. Pro. Ass'n of N.J. Dep't of Ed., 64 N.J. 231, 253 (1974). And contrary to the State's argument, PERC's ruling that a managerial executive must exercise independent authority meaningfully distinguishes between those positions that direct and formulate policy from those positions that merely implement policies created by higher-level supervisors. This is consistent with Turnpike Authority and PERC precedent and furthers New Jersey's public policy that favors including public employees in collective negotiations. PERC's approach to determining whether a non-State public employee qualifies as a managerial executive to preclude union membership is far from novel as the State seeks to convince us. On the contrary, PERC's final agency decision is a logical if not inexorable application of well-settled principles.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division